FLORENCE P. TUCKER Executrix of R. S. Tucker, v. J. H. SATTERTHWAITE and SALLIE (his wife) RHODA LITTLE, G. R SATTERTHWAITE, B. B. SATTERTHWAITE, J. J. SATTERTHWAITE and J. E. O'HEARNE.

(Decided December 6, 1898.)

*Trespass—Boundary—Course and Distance.*

1. The general rule is that from a known or agreed point, course an distance must govern, unless there is some natural object called for in the deed or grant, that is more certain than the course and distance called for.

2. To locate a line, the original order of survey must be observed and followed; and a positive line cannot be controlled by a reversed survey.

CIVIL ACTION in the nature of *trespass* to try title to land, tried before *Timberlake, J.,* at December Term, 1898, of the Superior Court of PITT County.

The plaintiff claimed under the John Brinkley grant

represented on the map, and it was agreed she was the owner of the land covered by it.

The defendants claimed under the William Smith grant represented on the map, and it was agreed that they were the owners of the land covered by it.

They were adjoining grants, the Northern line of the Smith grant being the Southern line of the Brinkley grant. The location of this dividing line is the only question in this case—other exceptions being abandoned.

The John Jordan grant is also represented, as it is referred to in both the preceding grants, and was used by both parties in support of their respective contentions—there are discrepancies and omissions connected with the diagram of these grants, but not sufficient to impair its usefulness for the purpose for which it was put in evidence.

The Jordan grant is dated October 21, 1782—its survey, July 31, 1781—its beginning corner is at $V$.

The Brinkley grant is dated October 21, 1782—its survey, October 9, 1781—its beginning corner is in dispute; the plaintiff claims it at $H$. the defendants say at $L$.

The Smith grant is dated November 6, 1784—its survey August 1, 1781—its beginning corner is at $A$.

The boundary calls of these three grants are reiterated in the opinions, where they may be seen.

The Brinkley grant tho' prior in point of date, to the Smith grant, refers to it—explainable by the fact that the survey upon which the Smith grant issued was prior to that of the Brinkley grant.

The Smith grant, beginning at $A$, runs to $B$, then to $C$, then to $D$, then to $E$, then to $F$, which are all agreed corners. The line from $F$, which is the dividing line between the two grants—the Brinkley and the Smith, is

in dispute. The call in the Smith grant from $F$ reads : "Thence West two hundred and ninety poles into John Jordan's line." The plaintiff contended that this call should be run just as it reads, and that being so run, according to the evidence it would strike the Jordan line at 44, which would locate the *locus in quo* North of the Smith, or defendant's grant and include it inside of the Brinkley, or plaintiff's grant. And the plaintiff insisted that this was a question of law, and that his Honor should so instruct the jury.

The defendants contended that they had shown facts sufficient, upon which the jury might find that there was a mistaken call, or an omitted call in the lines of the Smith grant, and that the point in the Jordan line, where the line from $F$ running West 290 poles struck it was a mixed question of law and fact to be determined by the jury upon the whole evidence, under proper instructions from the court. That point, they insisted, was at $G$.

It was in evidence, that to run the dividing line as claimed by plaintiff would disarrange the remaining calls of the plaintiff's grant, and disturb the boundaries of the Jordan grant, recognized by both plaintiff and defendants—that if the Smith boundary lines were reversed, they would follow along the well settled marked lines of Smith and Jordan to the corner $G$, claimed by defendants as a corner of the Smith grant—that if the dividing line is run from $F$ to $G$, every subsequent call of the Smith grant from $G$ to $A$ could be run along the line of the Jordan grant—that old marked trees were found in running the calls of the Brinkley grant as claimed by defendants.

After full argument, on both sides, his Honor stated

123—33

(Map referred to in Tucker v. Satterthwaite.)

that he should hold, that in running the Smith grant
that the line would run West from "F" the admitted
corner, into the John Jordan line, and that upon all the
evidence, it appearing that such a line would strike the
John Jordan line at "44," he would instruct the jury
that a due West line from *F* to 44 would. be the proper
line of the Smith. grant.

Defendants excepted.

Verdict finding all issues in favor of plaintiff.

Judgment for plaintiff.    Appeal by defendants.

*Messrs. T. J. Jarvis* and *Bond & Fleming*, for de-
fendants (appellants).

*Messrs. W. B. Rodman* and *Jones & Boykin*, for
plaintiff.

FURCHES, J., delivers the opinion of the Court.
DOUGLAS and CLARK, J. J., dissenting.

FURCHES, J.:   On the 6th day of November 1784 the
State granted to William Smith, a certain tract of land
in Pitt County, beginning at a gum in Beaver dam poco-
sin and John Jordan's corner, thence S. 59 degrees E.
240 poles; then N. 20 degrees East 242 poles, thence N.
66 degrees W. 80 poles, thence N. 60 poles, thence N.
25 degrees W. 120 poles to a pine, thence W. 290 poles
to John Jordan's line, thence South with Jordan's line
40 poles, thence S. 35 degrees E. 130 poles, thence S. 20
E. 40 poles, thence S. 10 degrees E. 100 poles, thence to
the beginning.

That on the 21st day of October, 1782, the State grant-
ed to John Brinkley a tract of land bounded as follows :
"Beginning at a pine, John Jordan's corner, in the Bee
Gum Island, thence N. 40 poles to a pine, thence E. 240

poles into Matthew Hodges line, thence with his line S. 122 poles to a pine into William Smith's line, thence with his line West 240 poles to a pine his corner in Jordan's line, thence with Jordan's line to the beginning." Bee Gum Island is not located, and cuts no figure in the case.

And on the same day, the 21st of October, 1782, the State granted to John Jordan a tract of land, the second call of which strikes the William Smith grant at its beginning corner, thence calling for an agreed line with William Smith, N. 42 degrees W. 202 poles, thence N. 10 degrees E. 100 poles, thence N. 20 degrees W. 40 poles; thence N. 50 degrees W. 130 poles, thence N. 86 poles; which carries the Jordan line further North than the intersection of the Northern boundary of the Smith grant, as claimed by either party.

There appears to be some inconsistency in the calls and dates of these grants. The John Brinkley grant is dated October 21st, 1782, calling for the line of the William Smith grant, dated November 6th, 1784. But this is susceptible of explanation, from the fact that the Smith *survey* was made on the 1st day of *August*, 1781, and the Brinkley survey was made on the 9th day of October, 1781.

The plaintiff is admitted to be the owner of the lands included in the Brinkley grant, and the defendant is admitted to be the owner of the lands included in the Smith grant. This being so the sole question depends upon the location of the Northern boundary line of the Smith grant. The Brinkley grant calling for this line of the Smith grant and thence with it West to Smith's corner on the Jordan line, the boundary line of the Smith grant is necessarily the southern boundary of the Brinkley grant.

This was recognized on the argument as the sole question in the case—the defendant's counsel stating this to be so, and abandoned all other exceptions he had in the record of the case on appeal.

To locate the Northern boundary of the Smith grant, it is necessary to start at the beginning corner, which is admitted by both parties to be at A on the map, then to B, then to C, then to D, then to E and then to F. These points are all agreed to by both parties, including A. and F. The call from F is West 290 poles to John Jordan's line, which the plaintiff says is at 44 on the map.

The defendant admits that a due west line run from F 299 poles would strike the Jordan line at 44 as claimed by the plaintiff; and that if this is the correct line, that is, the Northern boundary of the William Smith grant, then the plaintiff is entitled to recover.

But the defendant claims that this is not the Northern boundary line of the Smith grant, and contends that it runs from F to G. And the plaintiff admits that if this line from F to G is the true boundary line, that is the Northern boundary line of the Smith grant, she is not entitled to recover.

The defendant claims to arrive at the conclusion that G is the proper terminus of the line from F West 290 poles to the Jordan line, by reversing the calls and distances, from the beginning corner at A; or rather, by surveying the John Jordan line, North from A according to course and distance ; and the defendant claims that this will show G to be the proper terminus of the West end of the line from F. This contention of the defendant violates all rules of construction, as we are taught to understand them.

The first general rule, to which we know of no ex-

ception, is that from a known or an agreed point, course
and distance must govern, unless there is some natural
object *called for in the deed or grant*, that is more cer-
tain than the course and distance called for.

F is the last admitted corner in the Smith grant, and
the call from this station is "West 290 poles to Jordan's
line." There is no natural object called for to change
the course, *called* for in the grant, as the only nat-
ural object called for in the grant is Jordan's line,
and this is reached by running the course called for.
The distance called for, to intersect the Jordan line at 44
(this being the course of the call) is only 9 poles more
than the distance called for in the grant ; while the dis-
tance from F to G the point of intersection claimed by
the defendant, is 470 poles—180 poles more than the
distance called for in the grant. And when this line of
470 poles reaches G, it strikes the same natural object
that it strikes at 44 in running the course called for in
the grant. We admit that if the call in the Smith
grant had been West 290 poles to Jordan's line, and
that line could not have been reached except at G, that
the line in that event should go from F to G. But that
is not the case. The natural object called for is reached
at 44 by running the course called for in the grant, at a
distance of only 9 poles more than called for in the
grant. But as has been said the defendant claims to
arrive at the conclusion that G is the point of intersec-
tion, by reversing the line from A the admitted begin-
ning corner of the Smith grant, and by running the
John Jordan line North from the beginning corner
at A.

This cannot be done for reasons appearing in the
grant, nor can it be done for legal reasons established
by the rules of interpretation in such cases. The physi-

cal or mathematical reason, contained in the grant, is that neither course nor distance is given in the last call for the Smith grant—''thence to the beginning.'' This makes it physically or mathematically impossible to reverse this line. And as there are no known or admitted corners in the Smith grant, between the intersection of the line running West to the Jordan line, whether at G or at 44, it cannot be reversed.

It cannot be reversed for the purpose of fixing the intersection of the line West from F for legal reasons. The Smith grant was run from A to B, from B to C, from C to D, from D to E, from E to F, and therefore the line from F and those following is what are termed a posterior line, and cannot be located by a reversed survey. To locate a line, the original order of survey must be observed and followed; and a posterior line cannot be controlled by a reversed survey. This rule is too firmly established by numerous decisions of this Court to be disputed now. *Duncan* v. *Hall*, 117 N. C., 443; *Norwood* v. *Crawford*, 114 N. C., 513; *Graybeal* v. *Powers*, 76 N. C., 66; *Harry* v. *Graham*, 18 N. C., 76.

It is the Smith grant that we are locating, and it is the Northern boundary line which is in dispute. This line is not bounded by the Jordan grant, and cannot be located by a survey of that grant. This could not be done if the Smith grant had called for the Jordan line, South from the point of intersection, which it does not do. And the call in the Jordan grant for the line of the Smith grant can be no more than a declaration of Jordan that his line runs with Smith's. The Jordan grant calling to run with Smith's grant would be controlled by the Smith grant, and not the Smith grant by the Jordan grant. So it is plain that the Smith grant cannot be located by the Jordan grant.

It is contended (though not by counsel of defendant) that Smith intended to run his line from F somewhere North until he reached a point East of G, and then West to G.   This may be so, but if he did we do not know it, and there is nothing in the grant to show that he did.   Whatever we may suppose his intentions were, these are but conjectures now.   It is certain he did not do it, and we cannot do it for him.   *Graybeal* v. *Powers, supra.*

By every rule of construction known to us, the dividing line between the plaintiff and the defendant must run from F West to the Jordan line, which is admitted to be at 44.   The judgment below must be affirmed.

Affirmed.

DOUGLAS, J., dissenting:   I cannot concur in the opinion of the Court.   This is an action in the nature of trespass brought to try the title to certain lands, which depends upon the proper location of two grants, one to William Smith and the other to John Brinkley.   The real question in dispute seems to be whether the line constituting the Northern boundary of the Smith grant and the Southern boundary of the Brinkley grant runs from F, an admitted corner, to G or to 44 as shown on the plat filed in the case   The usual issues were submitted, all of which were found for the plaintiff.

The Court charged the jury as a matter of law that the line between the Smith and Brinkley grants must be run from F to 44 as contended by the plaintiff.   To this instruction the defendant excepted, and it is the only exception necessary for us to consider in our view of the case.

The grants herein referred to are as follows:

1. A grant from the State to William Smith dated

Nov. 6, 1784, in which the description is as follows, the beginning corner being at A: "Beginning at a gum in Beaver dam pocosin and John Jordan's corner, then down the pocosin the dividing line between said Smith and Jordan Brinkley, South 59 degrees, East 240 poles in said pocosin, then North 20 degrees, East 232 poles to a gum in the Pee branch and dividing between said Smith and William Little, then running a dividing between Smith and Howell Hodges, North 65 degrees, West 80 poles to a gum in said branch, then North 60 poles to a pine, then North 25 degrees, West 120 poles to a pine, then West 290 poles into John Jordan's line, then along his line South 40 poles to a pine, then South 50 degrees, East 130 poles to a pine, then South 20 degrees, East 40 poles to a pine, then South 10 degrees, East 100 poles to a pine, and to the beginning.

2. A grant from the State to John Brinkley, dated October 21, 1782, containing the following description, the beginning corner being at H or L: "Beginning at a pine John Jordan's corner in the Bee Gum Island, then North 40 poles to a pine, then East 240 poles to a pine into Matthew Hodges' line, then with his line South 132 poles to a pine into William Smith's line, then with his line West 240 poles to a pine, his corner in Jordan's line, then with Jordan's line to the beginning."

3. A grant from the State to John Jordan dated October 21, 1782, containing the following description, the beginning corner being at "V:" "Beginning at a pine, Jordan's corner, then running the dividing line, John Brinkley and said Jordan, North 32 degrees East 232 poles to a gum in the Beaver dam swamp, then running agreed line between William Smith and said Jordan, North 42 degrees, West 200 poles to a pine, then agreed line the second time North 10 degrees, East 100

poles to a pine, thence agreed line North 20 degrees, West 40 poles to a pine, then agreed line again North 50 degrees West, 130 poles to a pine, then agreed line again North 86 poles to a pine in a branch on the side of Bee Gum Island, then West 272 poles to a pine on a branch and crossing one pocosin, then down the branch South 80 poles to a water oak and in James Barrow's line, then with his line East 186 poles to his corner, then with his other line South 160 poles to Jordan's own line, then with his line South 60 degrees, East 40 poles, thence with his other line South 75 degrees East 80 poles, then along his other line to the beginning."

The surveys on which these grants were issued were made as follows: The John Jordan survey on July 31, 1781; the William Smith survey on August 1, 1781; and the John Brinkley survey on October 9, 1781. While the Brinkley grant was issued before the Smith grant, it is based on a later survey, and calling for the Smith line must be treated as the junior grant. Therefore the Smith grant, must be located first, and its Northern boundary, being called for by the Brinkley grant, will become the Southern boundary of the latter survey. There is thus no conflict; but even if there were, the Brinkley grant would be compelled to give way under the Act of 1777, which provided that a senior grant issued on a junior entry should be void.

It is worthy of note that the Jordan and Smith surveys were made on consecutive days and were practically simultaneous. The lines between them were evidently run but once, and were in their origin dividing lines, constituting really one continuous boundary made of several short lines with slightly varying courses. This line seems never to have been disputed, and there is positive testimony that it has been repeatedly run with-

out change of location, once while the Jordan land be-
longed to the devisor of the plaintiff.    Their boundaries
in reverse order completely coincide wherever they
touch.    This line may be regarded as settled, and be-
comes an important factor in the determination of the
issue now before us. . Both the Smith and Brinkley
grants, under which the defendants and the plaintiffs
respectively claim, begin and end by their very terms in
the Jordan line.    Therefore this Jordan line must be
located before the other surveys can even get a starting
point.    But the Brinkley grant calls for John Jordan's
corner as its beginning point, and when it reaches the
line now in question it calls for Smith's line, and thence
with Smith's line to a pine, Smith's corner in Jordan's
line.    How can we better locate Smith's corner in Jor-
dan's line than by fixing it where Smith and Jordan
located it in its *genesis?* ' If we begin the Brinkley survey
at "L" as contended by the defendants, we can run
every course and distance without material variation
and interfere with no one.    If however we begin at H,
as contended by plaintiff, and run thence to Y and
South to "14," we cannot possibly form a parallelogram
as called for in the grant.    Running East 240 poles,
South 132 poles, and West 240 poles must bring this
point directly South of the beginning.    And yet "44" is
evidently not directly South of "H."    It is admitted
that if Brinkley's line is run from F to 44, it *must* stop
at Jordan's line, which is considered as a natural boun-
dary.    But if Jordan's line from H to I is a natural
boundary as to Brinkley, why is it not a natural boundary
as to Smith? being an agreed line between Smith and
Jordan, for such is evidently the meaning of the grants?
*Jawett* v. *Hussey*, 70 Me., 433.    If we begin the Brink-
ley grant at H as claimed by the plaintiff, we not only
cut off a corner of that grant itself, but we utterly des-

troy the agreed and well settled line between Smith and Jordan, which is the beginning point and foundation line from which both the plaintiff and the defendants begin their surveys and derive their title. It will be obliterated from G to 44, and South of that it will proceed in the most eccentric fashion, cutting in first on Jordan, then on Smith, and back again on Jordan, and finally ending in somebody's land at least a hundred poles South-east of the beginning corner. Surely an honored age of a hundred years should protect it from such desecration.

There is positive testimony tending to show that there were marked trees at L, M, N and G, the corners of the Brinkley grant as claimed by the defendants, and that there were no marked corners except the common corner G, if it were located as claimed by the plaintiff. Among others, James Taylor, a surveyor, testified that he "found an old marked pine at Bee Gum Island, corner of John Jordan grant, and beginning corner of John Brinkley grant, as claimed by the defendants at L; pine set upon its stump showed very old marks pointing South, West and North; at M, found a gum marked as a corner; at N, found an old marked pine; at G, found a stake with three old marked trees as pointers, two pines and a gum. These marked trees were found in running the calls of the John Brinkley grant as claimed by the defendants. Found no *marked* trees in running the same grant as claimed by the plaintiff; both sides agreed that A was the beginning corner of the Smith grant and also corner of John Jordan grant; at K, found an old marked pine, at H found an old marked pine, marked as a corner and pointing the direction of the John Jordan grant lines, and this old marked pine is 40 poles south of the point G."

This evidence clearly tended to prove the contention of the defendant. The old marks on the pine at L were especially significant. County surveyors, in the homely phrase of the woods, say "howdye" and "goodbye" whenever they meet a tree, directly in the line, that is, they chop it on the side where the line first strikes and again where the line leaves it. The relative position of these chops distinguishes a line tree from a corner tree. If the chops are on the sides directly opposite to each other, the line passes on without variation; but if the marks are not opposite to each other, it is necessarily a corner tree, the distance around the tree between the marks roughly indicating the angle of the survey. The same tree may be the corner of two tracts in the line of the third, and would thus be marked on three sides. Where, as in the present instance, the survey of a parallelogram begins in the middle of one side, the last line would come up behind the first on the same course, and would therefore be marked as a straight line. This would be so were the Brinkley grant to begin at L. It is true that beginning at A and running the courses and distances of the Smith grant, we come to the admitted corner F. Thence the call is with Smith's line West 240 poles to a pine, Smith's corner in Jordan's line. Ordinarily this line would be run according to the course and distance, that is, directly west to Jordan's line at 44, but we have seen that this would completely disarrange all the remaining calls of this grant, seriously disturb the boundaries of the Jordan grant and practically obliterate an old and well settled line which is the beginning point of both surveys now under consideration. It is evident that such could not have been the intention of the grantor. The original plat printed in the record does not give us much assistance as it omits two

*admitted* lines of the Smith grant, one for 40 poles, and the other for 200 poles.   It seems probable that another line has been omitted from the Smith grant, running perhaps from F to Y, which would reconcile the calls of all the grants.   But be that as it may, I am satisfied that G was intended to be the North-west corner of the Smith grant, and as F is the next admitted corner, the line in dispute would run from F to G, as contended by the defendants, and not from F to 44 as contended by the plaintiff.

The next question is, can we give effect to what appears to us the evident intent of the grantor, and keep within the established rules of construction as laid down by the courts ?   I think we can.

In the construction of all deeds and grants, there is one essential object to be kept in view, and that is to ascertain the true intent of the grantor and to give full effect to that intention when not contrary to law.   All rules of construction adopted by the courts are simply *means* to a given end, being those methods of reasoning which experience has taught are best calculated to lead to that intention.   Hence all authorities unite in saying that no rule can be invoked, no matter how correct in its general application, that tends to defeat the intention of the grantor.   This doctrine is of such universal acceptance as to require but few citations more to illustrate its extent than to prove its existence.   It is well expressed by Chief Justice Shaw in *Salisbury* v. *Andrews*, 19 Pick., 250, 252, as follows:   "In construing the words of such a grant, where the words are doubtful or ambiguous, several rules are applicable, *all* however designed to aid in ascertaining what was the *intent* of the parties, *such intent when ascertained, being the governing principal of construction.*   And first,

as the language of the deed is the language of the grantor, the rule is that all doubtful words shall be construed most strongly against the grantor, and most favorably and beneficially for the grantee. Again, every provision, clause and word in the same instrument shall be taken into consideration in ascertaining the meaning of the parties, whether words of grant, of covenant or description, or words of qualification, restraint exception or explanation. Again, every word shall be presumed to have been used for some purpose, and shall be deemed to have some force and effect, if it can have. And further, although parol evidence is not admissible to prove that the parties intended something different from that which the written language expresses, or which may be the legal inference and conclusion to be drawn from it, yet it is always competent to give in evidence existing circumstances, such as the actual condition and situation of the land, buildings, passages, water courses, and other local objects, in order to give a definite meaning to language used in the deed, and to show the sense in which particular words were probably used by the parties, *especially in matters of description.*" *Salisbury* v. *Andrews, supra,* a case cited by nearly all text writers with uniform approval. In *Smith* v. *Parkhurst,* 3 Atk. Rep., 135, Lord Chief Justice Wills says: "Another maxim is that such a construction should be made of the words of a deed as is most agreeable to the intention of the grantor; the words are not the principal thing in a deed, but the intent and design of the grantor. We have no power indeed to alter the words or to insert words which are not in the deed, but we may and ought to construe the words in a manner the most agreeable to the meaning of the grantor, and may reject any words that are merely insensible. Those maxims, my

Lords, are founded upon the greatest authority, Coke, Plowden and Lord Chief Justice Hale, and the law commends the *astutia*—the cunning of Judges in construing words in such a manner as shall best answer the intent; the art of construing words in such a manner as shall destroy the intent may show the ingenuity of, but is very ill becoming a Judge." In *Campbell* v. *McArthur*, 9 N. C., 33, this Court held that "A mistake in the course and distance of a deed shall not be permitted to disappoint the intent of the parties, if that intent appears and if the means of correcting the mistake are furnished either by a more certain description in the same deed, or by reference to another deed containing a more certain description." *Ritter* v. *Barrett*, 20 N. C., 133; *Credle* v. *Hayes*, 83 N. C., 321. Devlin on Deeds, Section 835, says: "But it is doubtful how far arbitrary rules can be of service where the only object is to determine the intention of the parties. In fact the truth was well expressed by Mr. Justice Sanderson (38 Cal., 481, 487) who said that 'in the construction of written instruments, we have never derived much aid from the technical rules of the books. The only rule of much value, is to place ourselves as near as possible in the seats which were occupied by the parties at the time the written instrument was executed, then taking it by its four corners, read it'. This is the main object of all construction. When the intention of the parties can be ascertained, nothing remains but to effectuate that intention." Also, *Ibid*, Sections 836, 839, 1013; Sedgwick and Wait on Trial of Title to Land, Section 856; Tiedeman on R. P., Section 827; Washburn on R. P., p. 403, par. 21, and p. 408, par. 24. While the deed itself is the evidence of the intent of the parties, there are frequently latent ambiguities which must be ex-

plained by parol testimony or other evidence *aliunde*, such as deeds or plats referred to therein.  It is well settled by this Court in repeated adjudications that a mistake in course and distance will not be permitted to defeat the intent of the parties if such intent otherwise appears from the deed, and that any course and distance may be disregarded when it conflicts with a natural or artificial monument, a marked line of the same tract, or a well known line of another called for in the deed. A number of authorities are cited in *Bowen* v. *Gaylord*, 122 N. C., 816, which it is unnecessary here to repeat. Brief reference to a few will show to what extent this rule has been carried:

In the leading case of *Person* v. *Rountree*, 2 N. C., 378, repeatedly cited and approved, the course of the first line was "North" from a creek, so as to put the entire tract on the *North* side.  The marked line ran South from the creek, so as to put the whole tract on the *South* side of the creek.  It was held that the *marked* line controlled.  In *Anon.* v. *Beatty*, 2 N. C., 376, this Court says:  "The beginning of the last line is not disputed, the only question is where it terminates. . . . . Should we run from the beginning of the last line but one, directly to the hickory at the point of the island, we leave the marked line, proved to be marked as a boundary, and leave out a part of the land intended for the patentee.  The Court, therefore, is of opinion that the marked line should be pursued till it strikes the island, and that from thence to the hickory along the edge of the island shall be *deemed another boundary*, and the last line be drawn from thence to the beginning."  The opinion corresponds with the suggestion that an entire line running from F to Y may have been

omitted from the grant now in question. In *Cherry* v.
*Slade*, 7 N. C., 82, these matters are elaborately treated
by the first Chief Justice of this Court.

In *Hough* v. *Dumas*, 20 N. C., 328, this Court affirmed
the judgment approving the charge of Chief Justice
Pearson, then on the Superior Court, in which he said:
"That if the jury were satisfied that the corner of the
Gad tract at A was the corner called for in the Love
grant, then they must go to A and it made no differ-
ence whether from I they went to T and then around to
A, or whether from I they went to U, W, Q, A or to V,
X, Q, A, for in either way after getting to A then the
next call, which it was admitted would go to N, an es-
tablished corner, *and so around*, would take in the land
in dispute." So in the case at bar if the jury believe G
to be the true corner of the Smith grant, it makes no
difference whether they go from F direct to G or from
F to Y and thence to G, as either way "would take in
the land in dispute."

In the case of *Credle* v. *Hayes*, 88 N. C., 321, 324,
this Court held that every line in the deed should be
changed, saying: "If the calls of courses in the deed
should be held to be the true boundary of the land con-
veyed, the intent of the parties would be entirely disap-
pointed; for the deed, according to the calls, covers no
part of the land evidently intended to be conveyed. In
*Long* v. *Long*, 73 N. C., 370, an additional line was in-
serted by the Court, citing *Cherry* v. *Slade*, *supra*, and
*Shultz* v. *Young*, 25 N. C., 385. In *Clark* v. *Wagner*,
76 N. C., it was held that a call in a grant reading as
follows: "Beginning on a stake, the upper end of the
island, thence south 35 degrees east 53 poles to a stake,
the lower end of the island," which ordinarily would
be a straight line, should be run from the upper end of

island number 1 to the upper end of island number 2, thence around island No. 2 back to the lower end of island No. 1, and thence along the second call to the third corner. Thus to effectuate the intent of the grantor, a call which under the ordinary rules of construction would be a straight line, is cut up into three different lines, two straight and the other meandering, varying in the aggregate nearly 180 degrees from the original course.

It is contended on behalf of the plaintiff that to locate a line, the original order of survey must be observed and followed, and that a posterior line can not be controlled by a reversed survey, citing us to *Duncan* v. *Hall*, 117 N. C., 443; *Norwood* v. *Crawford*, 114 N. C., 513; *Graybeal* v. *Powers*, 76 N. C., 66, and *Harry* v. *Graham*, 18 N. C., 76. This is undoubtedly the general rule, but every one of these cases recognizes the principle that the rule does *not* apply where the *posterior line is more certain* than the prior line, and would more clearly indicate the intent of the grantor. See above cases. 18 N. C., p. 79, line 7; 114 N. C., p. 518, line 1 of opinion, and p. 520, line 2; 117 N. C., p. 446, line 3. *Graybeal* v. *Powers* does not seem to touch this point. I think the true rule is laid down in *Harry* v. *Graham*, *supra*, as cited by Chief Justice Pearson in *Safret* v. *Hartman*, 52 N. C., 199, in which it was held that the survey *could* be reversed, to-wit: "It was decided in that case (*Harry* v. *Graham*, 18 N. C., 76) that a posterior line could not be reversed, in order, by its intersection with a prior line, to show the corner *unless* such posterior line was certain, because to do so would be to extend the *distance* of the prior by the *course* of the posterior line. *The chance of mistake resting on one or the other being equal*, it was deemed proper to

follow the order in which the survey was made. But the Court say, 'so if even upon such calls as this deed contains, a line of *marked* trees was found, by tracing the line back from the post oak, corresponding with the survey of the 300-acre patent, that might carry the other line to the point of intersection, because it would prove an *actual* survey, and be the evidence of permanent *natural* objects, to show where the black oak once actually stood, which, wherever it stood, would be the terminus, and control the distance mentioned in the deed." See also *Dobson* v. *Finley*, 53 N. C., 495, and *Cowles* v. *Reeves*, 109 N. C., 417.

In the case at bar, if the Smith boundary were reversed, it would follow along the well settled and marked line of Smith and Jordan to the corner G, which the testimony tends to show has been *actually* surveyed at least four times, once by the devisor of the plaintiff. The beginning corner is presumed to have been selected by the parties on account of its greater certainty, but any other corner that can be definitely ascertained is of equal dignity, especially as far as its connecting lines are concerned. Am. and Eng. Enc. of Law (2nd Ed.), p. 763 and note. It is a leading and well settled rule in the construction of all instruments, laid down by Gaston, J., in *Shultz* v. *Young*, *supra*, "that effect should be given to *every part thereof*, and in expounding the descriptions in a deed or grant of the subject matter thereof, they ought all to be reconciled if possible, and as far as possible. If they cannot stand together, and one indicate the thing granted with superior certainty, the other may be disregarded as a mistaken reference." Washburn, *supra* (5th Ed.), p. 422, par. 37, and cases cited. In *Ferguson* v. *Bloom*, 144 Pa. St. Rep., 549, 565, the Court

holds that "as between two proposed methods of location, where the work on the ground will permit, that should be preferred which fills the largest number of the calls of the return of survey." In view of these established principles as applied to the facts in this case, I think the Court below erred in instructing the jury that the line in dispute must run from F to 44 as a matter of law. The location of this line should have been left to the jury as a mixed question of law and fact under proper instructions from the Court. As said by Pearson, C. J., in *Clark* v. *Wagner*, *supra*, "this is the governing fact in the case, and ought to have been distinctly left to the jury with instructions to consider *all of the evidence and the surroundings* of the case, including the marked line trees and corners, and the plat annexed to the grant, the tradition of old persons, the land and the nature of the river . . . . and *other like matters*." This is substantially the instruction approved in *Reed* v. *Prop. Locks and Canals*, 8 How. (49 U. S.) 274, 288.

For error in the instructions of the Court as above set forth, I think there should be a new trial.

CLARK, J., concurs in the dissenting opinion.