VERMONT MARBLE COMPANY *v.* GEORGE P. EASTMAN AND
PERCIVAL W. CLEMENT.

Special Term at Rutland, November, 1915.
Motion for re-argument heard at the October Term, 1916.

Present: MUNSON, C. J., WATSON, HASELTON, POWERS, and TAYLOR, JJ.

Opinion filed May 1, 1917.

*P. S. 1286—When Applicable—Chancery Rule 46—Exceptions
to Report—Transcript—When not before Court—Excep-
tions not Briefed — When Exceptions not Considered—
Harmless Error — Deeds — Construction — Boundaries —
Courses and Distances—Interpretation—Deeds, Surveys and
Plans not Referred to—Divisional Line—Question of Fact—
Words and Phrases — "Decision" — Latent Ambiguity—
Abuttals and Monuments—Place of Beginning—Order of
Calls—Extrinsic Evidence—Statute of Frauds—Memoran-
dum—Acquiescence in Boundary Line—Adverse Possession
—Claim of Right—Successive Disseisors—Tacking Posses-
sion—Privity—Recitals in Deed—"Adjacent to"—Bond for
Deed — Merger—Parol Evidence—Error not Presumed—
Intendments on Review—Time of Record of Bond for Deed
—Privity—Burden of Proof—Surveys of Land—When not
Considered in Construction of Contracts or Deeds—Co-
tenants—Agreements as to Boundaries—Prescriptive Rights
—Claim of Right—Evidence.*

P. S. 1268, providing that no question regarding the admission or re-
jection of evidence in hearings before special masters shall be heard
in Supreme Court unless objection is made by exception to the
report duly filed in court, is applicable when the cause is heard
before a chancellor.

Where plaintiff was not notified by the county clerk of the filing of
defendants' exceptions to the finding of facts made by a chancellor,
as required by Chancery Rule 46, the benefit of the exceptions will
not be denied the defendants, although it does not appear that a
copy of the exceptions has been filed by them in accordance with
Chancery Rule 47.

A transcript of testimony, which is not made a part of the chancellor's report, is not before the Supreme Court on appeal, although it is referred to in the exceptions to the report, and made a part of such exceptions.

Exceptions not briefed by the exceptor are waived.

Exceptions to a chancellor's report involving the examination of evidence not before the Supreme Court will not be considered.

An exception to a chancellor's report will not be considered where, conceding that the chancellor was wrong, the excepting party was not harmed.

Where the first call in a deed was "commencing at a point on the first stone wall west of the highway * * * 10 rods south of Mead's north line," *held*, the point of beginning should be located by measuring 10 rods due south from the north line, and not by measuring that distance along the wall, which ran in a southwesterly direction.

It is a rule of construction that where a boundary line is described in a deed as running toward one of the cardinal points of the compass, it should be considered as running directly in the course, unless some other word or words are used for the purpose of qualifying its meaning or its direction is controlled by some object.

Where one of the calls in a deed described the line as running "thence southerly on said wall 10 rods," the words "on said wall," show that the course of the line is controlled by the course of the wall.

Where the distance of a course is definitely stated in a deed, without any monument as its termination, the course and distance must govern.

Where the language of a deed is clear and unambiguous it is to be interpreted by its own language, and the court is not at liberty to look at extraneous circumstances to ascertain its intent; for the understanding of the parties must be deemed to be that which their own written instrument declares.

A narrow strip of land *held* to be part of defendants' grant, where it was admitted to be such by the pleadings and where it was manifest that it was according to the practical construction which had always been given to the deeds through which defendants traced their title.

Deeds, surveys, and plans not referred to in a deed can neither restrict nor extend the import of the terms used therein.

The location of a disputed divisional line was a question of fact to be determined on the evidence.

A finding of the chancellor that "the decision is that the line between
the two properties involved is the so-called pin line," does not
state a conclusion or law, but the word "decision" was used by him
in the sense of an inference from other facts reported.

The fact that the length of a course required by a call in a deed, to its
termination which is given as a maple tree, ·is about 1 and 8/10
rods shorter than the distance stated in the deed, does not con-
stitute a latent ambiguity.

As between courses and distances in a deed on the one hand, and
abuttals and monuments on the other, the latter, when identified,
must control, because mistakes in courses and distances are more
probable and frequent than in abuttals and monuments, capable of
being clearly designated ·and accurately described.

Where the place of beginning in the description in a deed is well
known and well ascertained, it must govern, and the grant must
be confined within the boundaries given in the deed.

,Where there is no uncertainty in the description in a deed, to locate
the lines the regular order of the calls should be observed and fol-
lowed; and a posterior line cannot be controlled by a reverse
survey.          ·

Extrinsic evidence is not admissible to show that, by mistake, one
tract of land instead of another was inserted· in a deed, thereby
really establishing a different contract.

Written statements relative to the boundaries of certain land, *held*
not sufficient as a memorandum to answer the requirements of the
Statute of Frauds, because they did not contain the substantial
terms of any contract for· the sale of land, or of an interest in
land, expressed with such certainty that they might be understood
from the contract itself or from some writing to which it referred,
without resorting to parol evidence.

A mutual recognition and acquiescence in a certain line as the boundary
line between two properties is without force, unless followed by
such possession of the land beyond the true divisional line and up
to the line thus recognized for the period of fifteen years as shall
give a perfected title by adverse possession.

The possession of land, not shown to be under a claim of right, is not
adverse.

Where no privity of estate or of possession between successive disseisors
is shown, their several possessions cannot be tacked so as to make
a continuity of possession, but, upon the termination of the pos-
session of each disseisor, the seisin of the true owner revived and

was revested, and a new distinct disseisin was made by each successive disseisor.

The defendants, not having had possession of the land in dispute for the period of fifteen years, could not, in point of time, have acquired any adverse rights therein.

Recitals in a bond for a deed that certain parties had "taken a bond for a deed of the piece of land south of and adjacent to said premises," and in the latter bond that "said Mead having this day executed a bond to them (the obligees named in the first bond) thereby agreeing to convey to them * * * * the piece of land north of and adjacent to the premises," are not any part of the description of the lands thus mentioned, and are not intended to affect it, because the words "adjacent to" do not necessarily imply "adjoining" or "contiguous."

A bond for a deed is an executory contract, and is conclusively merged in the deed provided for therein, when delivered and accepted as performance thereof, even though the terms of the deed may vary from those contained in the contract; and such deed, so far as its construction is concerned, must be looked to alone, to determine the rights of the parties, and cannot be contradicted or controlled in its operation by the contract, when not referred to therein.

Parol evidence is admissible to show the true time of the giving of a bond for a deed.

The Supreme Court cannot, for the purpose of finding error, assume that the evidence did not support a finding of a chancellor.

Every reasonable intendment is to be made in favor of a decree under review.

The fact that one of two bonds for a deed, executed contemporaneously and describing respectively two adjacent parcels of land the division line between which is in dispute, was placed on record before the other gave it no priority as a contract for title.

Where the division line between land of plaintiff and defendants was in dispute the burden of proof on the question whether a certain plan and survey, locating the line as claimed by defendants, was authorized, or caused to be made, or ratified by all the parties then in interest was upon defendants.

A survey and plan, not being participated in, authorized or ratified by all the parties to either one of two contracts to convey lands described in such survey, and not being referred to in the contracts, nor in the deeds given in pursuance thereto, cannot be considered in the construction of either the contracts or the deeds.

A written statement, relative to the disputed boundary of land, signed by one of several co-tenants is receivable in evidence against him, but not against the other co-tenants.

In order to make out a right by adverse possession to an easement, in connection with the use and occupancy of land, it is necessary for the owners of the land to prove an uninterrupted adverse enjoyment of the easement for a period of fifteen years by themselves or their predecessors in title, or both combined.

An agreement by one of several co-owners of lands establishing a doubtful or disputed boundary is not binding on the others unless they consent thereto, and so as a general rule all the parties in interest in the lands must be parties to the agreement.

A co-owner of land can gain a prescriptive right of easement therein only by user adverse to his co-tenants.

If a co-tenant enters upon the whole or part of the common property, as he has a legal right to do, the law presumes that he intends nothing beyond an assertion of his right. In order to sever his relation of co-tenant, and render his possession adverse, it must be affirmatively shown the other co-tenants had knowledge of his claim of exclusive ownership, accompanied by such acts of possession as were not only inconsistent with, but in exclusion of, the continuing rights of the other co-tenants, and such as would amount to an ouster as between landlord and tenant.

The burden is upon defendants to prove facts essential to the establishment of a prescriptive right of easement, claimed by them; and when the evidence in regard thereto is conflicting, it cannot be said, as matter of law, that the right has been established.

The acceptance of a warranty deed, upon valuable consideration, of an undivided interest in certain land, is evidence tending to show that the grantee's use thereof is not adverse or under claim of right as against his co-tenants.

APPEAL IN CHANCERY. Heard on bill and answer and facts found by the chancellor at the September Term, 1915, Rutland County, *Fish,* Chancellor. Decree for plaintiff. Defendants appealed.

STATEMENT BY WATSON, J. This case was heard before, and facts found by, the chancellor. Among other things reported and noticed in the opinion, the chancellor states the following facts:

The defendants did not at first claim to own as far north as they now claim. At the beginning of the trial and before finding some old plans (known as the Brown, the Green, and the Murphy plans) and surveys of the properties between which the dividing line is in dispute, they claim to a line 20 rods (measured along the line of a fence and wall on the easterly side of the premises) north of the maple tree at the southeast corner of the defendants' land, which is nearly 2 rods south of the line now claimed. The plaintiff claimed to own to a line 20 rods southerly at right angles with Mead's north line and parallel therewith; and, if it failed in establishing this line, it claimed to the so-called "pin line" which is a few feet further north and is obtained by measuring 10 rods south from Mead's north line and then 10 rods along the east wall. Each side introduced evidence tending to establish its claim as then made, and the hearing was about to close when the defendants, having discovered the old plans and surveys mentioned above, asked and were granted leave to file a cross-bill. Thereupon they filed an amended answer and cross-bill in which they claimed the true line to be a line parallel with Mead's north line and 20 rods north of the maple tree, at right angles to said north line. The line so claimed is 33.6 feet further north, measured along the easterly wall, than the line to which defendants before claimed, 3 rods 7½ feet north of a line 20 rods south of Mead's north line, and only 16 rods and 9 feet south of this north line. The area of defendants' quarry lot south of a line measured at right angles 20 rods south of Mead's north line is 7.184 acres; south of the "pin line" it is 7.436 acres; and south of the line now claimed by them it is 8.69 acres.

The chancellor states that the old surveys and plans which caused the defendants to claim the line to be 20 rods north of the maple tree, measuring at right angles to Mead's north line, and the evidence taken in connection therewith, induce findings as follows:

"In the fall of 1866, negotiations having been entered into between Andrew J. Mead and prospective purchasers of the quarry property, at the request of said Mead and Alanda W. Clark, one of the prospective purchasers, James Brown of Rutland, a surveyor, on September 26th went to West Rutland for the purpose of laying out the boundary lines of the marble property under consideration.

"Accompanied and directed by said Alanda W. Clark and Mr. Mead and his son, Eugene, Mr. Brown ran a line at right angles to the north line of the Mead farm, northerly from the point where two fences corner at the north side of a large maple tree. On this line he measured off 20 rods and then set a stake. Through this stake he ran a line parallel to the Mead-Blanchard line easterly to a stone wall, where he set a stake, and westerly to an old rail fence running northerly and southerly, and there set a stake. From the stake first set he continued the right angle line northerly 10 rods, and there set a stake, and from that stake ran easterly parallel with the Mead-Blanchard line to the said stone wall. From the maple tree he ran westerly along the line of a board fence 56 rods to the north bar post of a barway then standing and there set a stake, and then turned a right angle to the north and ran a line to meet the line parallel with the Mead-Blanchard line.

"On the same occasion a small piece of land was surveyed lying east of the parcel above referred to, its westerly boundary being a part of the easterly boundary of the large parcel, and the northwest corner being a point on the wall 18 feet southerly from the butternut tree. * * *

"No other parcels of land were surveyed by Mr. Brown. * * *

"On September 27, 1866, the day following Brown's survey a rough sketch or plan of the premises was prepared, and Mr. Mead made and retained a copy thereof for himself, showing in detail the boundaries, corners, monuments, and distances, and containing complete directions for drawing the conveyances as shown thereon. * * *

"By this survey and Mead's plan the boundary lines of the property bonded to Oliver and associates were indicated as follows: The east side of the property was bounded by a stone wall running in a northerly and southerly direction from a point near the maple tree referred to, to the north farm line between the Mead and Blanchard lots. From the southerly end of the wall there was a rail fence extending to the maple tree, and from the maple tree westerly in the south line of the premises surveyed was a board fence. About midway between the maple tree and the north farm line there was a small butternut tree standing on the east side of the stone wall. The northeast corner of the parcel surveyed and measured by Brown was 27 feet 3 inches north of the butternut tree and 143 feet 2 inches east of the 20-

rod point. The northerly line (of the property) was a line beginning at the stone wall on the east at the point 27 feet 3 inches north of the butternut tree, extending westerly through the 20-rod point and parallel with the Mead-Blanchard division line until it intersected a rail fence, which was the westerly boundary (of the property) at which place there was a stake and stones.''

Following the giving of the bond to Oliver and others, the corporation known here as the American Marble Company was organized and began to operate the property in the way of opening and developing a marble quarry thereon •and excavating the loose earth. In excavating and opening the quarry the loose dirt from the top and part of the stone taken out by blasting was dumped on the easterly side of the ledge north of the northeast corner of the quarry opening. This company continued its operations down to the early part of the year of 1871, when it became insolvent, and its property was assigned by the court of insolvency to Charles Woodhouse as assignee on the 7th day of April of that year. On the 21st day of July following, Woodhouse, as assignee, conveyed the property, subject to all incumbrances to A. N. Russell and others, who on the 23rd of August, same year, conveyed the same to the New American Marble Company. At the March term, 1871, of the court of chancery, Mead brought proceedings to foreclose a mortgage of January 4, 1869, given by the American Marble Company on the property, and a decree was entered in his favor, which decree became absolute April 27, 1872. On the 1st day of July, 1873, Mead conveyed a one-eighth interest in the premises to Stillman C. White, and seven-sixteenths interest to Isaac M. Hillman, and seven-sixteenths interest to Lyman A. Bardin. At the March term, 1875, of the court of chancery, Bardin and Hillman, assignees of another mortgage on the property given by the American Marble Company, foreclosed the same against the New American Marble Company and Stillman C. White; the decree becoming absolute March 27, 1876. In 1875 Bardin and Hillman mortgaged their seven-eighths interest in the property to one Thrall, who, at the March term, 1878, of said court, obtained a decree of foreclosure which became absolute April 12, 1879. On the 16th day of the same month, Thrall conveyed said seven-eighths interest to said Bardin.

At the time the property was being operated by the American Marble Company, there was a wooden post set at the point

located by Brown as the northeast corner of the property, which post was on the west side of the stone wall before mentioned, and 27 feet 3 inches north of the butternut tree. Westerly of this post and between the post and the ledge was a large square cut marble block in the center of which was an iron pin, bent to hold a guy from the derrick, and westerly over the ledge there was a row of large iron pins of various heights about $1\frac{1}{4}$ inches in diameter and from 1 foot to $2\frac{1}{2}$ feet above the ledge; and west of the ledge was an apple tree standing in the line. These objects were practically in the line, and, except the apple tree, were apparently intended to mark a boundary.

During the time that company was operating the property, a boarding house had been erected a considerable distance west of the quarry opening, and about halfway between the ledge and the west fence line of the property. This boarding house was occupied during this period by a man named Burr, an employee of the company, and with whom some of the other employees boarded. While these premises were occupied by Burr, a portion of the land west of the ledge was inclosed as a garden in connection with the boarding house; the northerly fence of such garden beginning at a point on the west line fence and running easterly to the ledge. The easterly end of this fence was connected with the east end of the fence below referred to on the Brown and Green line, and also to the south line fence of the property by a fence running northerly and southerly across the property. The inclosure in which stood the boarding house was used and occupied by Burr as a garden, and the small inclosure north of the garden fence was used as a night pasture for Burr's cattle. The garden fence or board fence was about 30 or 40 feet north of the boarding house, and the rail fence on the north line was some 50 or 60 feet further north. At the time of Green's survey mentioned below, he found these fences as above set forth.

After the said Bardin obtained an interest in the property under this deed from Mead on July 1, 1873, he and Mead caused the premises to be resurveyed by G. E. Green, a civil engineer, in the latter part of July, same year. Green surveyed the entire premises, including the small lot lying to the east, and which has been sold by Mead for a dumping ground for the refuse from the mill. Prior to the time of this survey, the wooden post at the northeast corner of the premises had disappeared, and a marble post had been set on the opposite side of the wall, which

28

post Green found to be 27 feet 7 inches north of the butternut tree and 146 feet east of the 20-rod point, or, as designated on Mead's plan, "point No. 1."

Green ran the northerly line of the property beginning at the marble post designated on Mead's plan as "corner A" westerly through "point No. 1," or the 20-rod point, found the iron pin in the large square-cut block to be in line; and in running over the ledge found five large iron pins in a row, two of which were exactly on the line; and in running westerly over the ledge along the fence before referred to found that the line passed over a point projecting from a peculiar large flat rock; and continuing the line westerly to the west line fence where he found a stake in stones in the center line of the old rail fence, which was the westerly boundary of said premises. A short distance westerly of the large flat rock and some 10 or 12 feet north of the line, he found a marble post which Mead said was set to mark the original southwest corner of the Clark lot or "second lot B." At this time, there was a marble post on the east side of the stone wall before referred to and 39 feet south of the apple tree. This post was at the end of a line drawn parallel with the Mead-Blanchard divisional line, and intersected the continuation of the right angle line before referred to running northerly from the maple tree at a point 10 rods north of the Brown and Green line. The post at the time of the hearing had apparently been buried many years. There was no evidence that it was ever above the ground, and, if it was, it was buried before 1890.

Green discovered and called to the attention of Woodhouse, Clarks, and Mead, the fact that the calls in the deed concerning the boundary did not correspond with the monuments and objects on the land, and that the marble post marking the northwest corner of the 96-rod piece was 8 feet farther south of the butternut tree than Brown had found and Mead's plan shows. Green located points on the Clark lot where derrick guys were fastened, and, having completed his survey, made a scale drawing of the same, showing in detail the monuments, courses, distances, buildings, fences, outline of the quarry opening, outline of the quarry dump, and the guy hitches located on that lot; and also made complete notes of the plan with regard to the various points and matters relating thereto. After the plan had been completed and the parties had verified the work, the following statement was placed on the plan: "July 29, 1873, boundaries, corners,

measurements and notes made hereon, are agreed to and witnessed as correct." This statement was signed by A. J. Mead who at that time owned a one-tenth interest in the Clark lot, by one Marcellus Newton who was familiar with the property, by Charles Woodhouse who was secretary of the American Marble Company, and at that time one of the owners of the small parcel or dumping ground, and was also signed by J. E. Manley who was Mead's attorney.

A statement was made and signed by H. G. Clark (who at the time owned a three-tenths interest in the Clark lot or "second lot B," and was also one of the owners of the small parcel or dumping ground) as follows:

"July 28, 1873.

"This is to say whereas myself and others purchased options on two adjoining pieces of property, one on September 29, 1866, and one on October 2, 1866, both being owned by one A. J. Mead and which were both later on deeded on January 1, 1869; and whereas, in both deeds it has since been found out that the way in which the said parcels were described in the records is not equivalent to the parcels as originally laid out and marked by one Jas. Brown and agreed to by the said Mead and ourselves. Now, therefore, for $1.00 lawful money to me in hand paid, I hereby agree that the said properties shall be and remain as originally laid out by said Brown and that the survey by one G. E. Green signed by A. J. Mead and M. Newton on July 29, 1873, and now in possession of one J. E. Manley is accordingly correct and satisfactory to us. Together with the agreements cited thereon especially as to our acknowledging the sale of the right to attach three guys at or about the points on our ten-rod lot as now in use.

"[Signed] H. G. Clark.

"Witness:
        "Charles Woodhouse."

In making the foregoing survey and plan, Green was employed by both Mead and Bardin, and each paid one-half of his charges therefor.

The line from corner "A" through "point No. 1" and the pin in the marble block extended westward, passes over a large flat rock with a peculiar jagged point extending upward in the line. At the westerly extremity of this line in the bottom of the old rail fence now remaining, there was found evidence of a stake

with stones around it. The position of this line is shown on plaintiff's plan Exhibit 118 as the line marked "C," and is further shown on defendants' plan Exhibit 38.

The distance from the Mead-Blanchard divisional line to the maple tree, measuring at right angles to said line, is 36 rods 6½ feet, and, measuring along the wall, is substantially 39 rods. The marble monument standing east of the wall 27 feet 7 inches northeasterly of the butternut tree, the wooden post standing west of the wall 27 feet 3 inches northeast of the butternut tree, the marble post on the flat standing at point No. 1 on the Brown, Mead, Green, and Murphy plans, the large square marble block with the iron pin leaded into it, the row of five large iron pins, the fence running westerly from the blazed apple tree, and the stake and stones in the west line, were for the purpose of marking the northerly boundary of the American Marble Company property.

At some time after Eastman began operations, the old derrick was replaced by a new one, the latter being guyed at substantially the same locations as the former, excepting that there were not so many guys on the new mast as there had been on the old. The guy which had formerly been fastened to the marble block with the line pin was moved slightly to the rear of the block, and the guy theretofore fastened to the walnut tree was moved a little to the west and fastened to an anchor set in the ground as the tree was considered unsafe for that purpose. The defendants are maintaining upon the premises which the plaintiff claims to own three guy attachments. These are north of the so-called "pin line."

Lyman A. Bardin died in June, 1887, and the property, including the dumping ground lot on the east, passed under his will to his widow, Phœbe J. Bardin.

In 1884-85, Lyman A. Bardin wrote letters to his son, who was then operating the quarry at West Rutland. These letters were introduced in evidence, and (in part) are quoted in the findings of fact. Therein Bardin said, among other things:

"We call for a right of way to pass and repass and also twenty rods in front of our mill. * * * We want our number of rods in front as specified upon the records, and also our right of way. I will send you a copy of the mortgage decree which is the same word for word as Mead's deed to the American Marble

Company reads, and I want you to keep the copy, as it contains the survey of our property.''

''We want our lines established as our deeds and titles specify. * * * We want our twenty rods as our title specified. * * *''

''In surveying the premises I should make right angles to all the corners on the west side of our lot made parallel with Mead's north line after I had taken our twenty rods from the twenty-rod point south of Mead's north line. I should then run down and see where it would locate the corner by the maple tree; and I would commence and run the line from the twenty-rod point on the east side and see if they two would agree. What we want is our twenty rods and the right of way.''

''Now as to the survey of our quarry I think the way you propose is the correct way, *i. e.,* run out the line from *starting point* [underscored by Bardin] and plant your corners as the title reads, and if Mr. Mead is not satisfied, let him move them by law. * * *''

Neither of the defendants ever occupied or possessed land north of a line parallel with, and 20 rods south of, Mead's north line, before the deed from Howe to Eastman, May 29, 1903. It is further found that none of the following persons: John W. Howe individually or as trustee; the Rutland White & Blue Marble Company; the Rutland White Marble Company; A. L. Burbank as trustee or individually; J. W. Howe; H. T. Buck; M. H. Murphy; C. H. Bardin; the Rutland County Marble Company; Charles H. Barbour; Phœbe J. Barbour (the record indicates that this last name should be ''Bardin''); Lyman A. Bardin; Isaac N. Hillman; Sarah A. Hillman, or Ransom B. Hillman—ever occupied land north of the present ''pin line,'' unless it may have been in the way of dumping some refuse from the quarry now owned by the defendants, or by placing marble block on the land.

The plaintiff became the owner of an undivided nine-tenths interest in the land immediately north of the line in question, by deed from Walter W. Fant, dated May 27, 1890; of an undivided two-thirds interest in an undivided one-tenth part of this land, by deed from John Mead, Charity Burr and her husband, dated July 6, 1905; and of the other one-third interest in an undivided one-tenth part, by deed from defendant Eastman, (under order of the court of chancery,) dated November 15, 1911. This land has sometimes been spoken of or referred to as the ''Fant lot,''

or "Fant property." It has also sometimes been called the "Clark lot," and on Brown's plan it is marked "second lot B."

*F. C. Partridge, Lawrence, Lawrence & Stafford* and *T. W. Moloney* for plaintiff.

Brown's survey and the other plans and similar evidence cannot control the plain language of the deeds. *Clement* v. *Bank of Rutland,* 61 Vt. 298; *Grand Trunk Ry. Co.* v. *Dyer,* 49 Vt. 74; *Vt. Central R. R. Co.* v. *Estate of Hill,* 23 Vt. 681, 684; *Smith* v. *Fitzgerald,* 59 Vt. 451, 458; *Butler* v. *Gale,* 27 Vt. 739; *Cilley* v. *Bacon,* 88 Vt. 496; *Kinnear & Gager Mfg. Co.* v. *Miner,* 88 Vt. 324.

The burden of proof of every element necessary to establish title by adverse possession rests upon the party setting it up. The findings are inadequate for the basis of any such claim. *Wells* v. *Austin,* 59 Vt. 157, 166.

The findings do not sustain the claim of the establishment of a line by acquiescence. *Blondin* v. *Brooks,* 83 Vt. 472, 481.

*John G. Sargent* and *Walter S. Fenton* for defendants.

The divisional line was established by recognition and acquiescence of the owners of the lots on both sides for more than fifteen years. *Jackson* v. *Ogden,* 7 Johns. 241; *Jackson* v. *Freer,* 17 Johns. 29; *Frost* v. *Spaulding,* 19 Pick. 445, 447; *Boyd's Lessee* v. *Graves et al.,* 4 Wheat. 514; *McCormick* v. *Barnum,* 10 Wend. 109; *Jones* v. *Pashby,* 69 Mich. 459; *Smith* v. *Hamilton,* 20 Mich. 433; *Davis* v. *Judge,* 46 Vt. 655, 673; *Brown* v. *Edson,* 23 Vt. 435, 450-1; *Clark* v. *Tabor,* 28 Vt. 222, 226-7; *Kip* v. *Norton,* 12 Wend. 127; *Virginia* v. *Tennessee,* 148 U. S. 502; *U. S.* v. *Stone,* 2 Wall. 525, 767; *Jones et al.* v. *Smith,* 64 N. Y. 180; *Brown* v. *Caldwell,* 10 Serg. & Rawle 114; *Terry* v. *Chandler,* 16 N. Y. 354; *Kellogg* v. *Smith,* 7 Cush. 375; *Cheney* v. *Waltham,* 8 Cush. 327; *Jackson* v. *Van Cerlaer,* 11 Johns. 127; *Sawyer* v. *Fellows,* 6 N. H. 107; *Ackley* v. *Buck,* 18 Vt. 395, 396.

It was competent to receive parol evidence to identify the property described in the bonds and deeds. 2 Washb. Real Prop. (2nd ed.) 662, 673, and cas. cit.: *Tego* v. *Medley,* 79 Wis. 211; *Lovejoy* v. *Lovett,* 124 Mass. 270, 274; *Dodd* v. *Witt,* 139 Mass. 63, 66; 2 Devlin on Real Est. (3rd ed.) 1933, 1934, 1935,

1938; *Dunn* v. *English*, 23 N..J. L. 126; *Jacob Tome Inst. etc.* v. *Crothers*, 87 Md. 569; *Reed* v. *Proprietors, etc.*, 8 How. 274; *Abercrombie* v. *Simmons*, 71 Kan. 538; *Walker* v. *Pierce*, 38 Vt. 94, 97.

A practical location of a boundary line acted upon, acquiesced in and recognized as the boundary by the owners of the lots on either side of such line is binding on grantees and successors in title. *Baldwin* v. *Brown*, 16 N. Y. 359; *Jackson* v. *Freer*, 17 Johns. 29; *Boyd's Lessee* v. *Graves*, 4 Wheat. 514; *Jones* v. *Pashby*, 67 Mich. 459; *Frost* v. *Spaulding*, 19 Pick. 445, 447; *Kellogg* v. *Smith*, 7 Cush. 375; *Clary* v. *McGlynn*, 46 Vt. 347; *Davis* v. *Judge*, 46 Vt. 655, 666-7, 673; *Clark* v. *Tabor*, 28 Vt. 222, 226-7; *Brown* v. *Edson*, 23 Vt. 435; *Burton* v. *Lazell*, 16 Vt. 158, 161; *Smith* v. *Hamilton*, 20 Mich. 433; *Beecher* v. *Parmelee*, 9 Vt. 352; *Ackley* v. *Buck*, 18 Vt. 395; *Sheldon* v. *Perkins*, 37 Vt. 550, 556; *Miles* v. *Barrows*, 122 Mass. 579; *Blaney* v. *Rice*, 20 Pick. 62; *Rockwell* v. *Adams*, 7 Cowen 761; *Jackson* v. *Van Corlear*, 11 Johns. 127; *McCormick* v. *Barnum*, 10 Wend. 109; *Sawyer* v. *Fellows*, 6 N. H. 107; *Simpson* v. *Blaisdell*, 85 Me. 199; *Hooten* v. *Comerford*, 152 Mass. 591; *Stone* v. *Clark*, 42 Met. 378; *Dodd* v. *Witt*, 139 Mass. 63.

WATSON, J. The primary question in this case is as to the true location of the divisional line between land owned by the plaintiff and land owned by defendant Eastman, the legal and record title to which latter is held by defendant Clement in trust, the same being in the nature of an equitable mortgage and not otherwise.

Both sides discuss, more or less, questions regarding the admission or rejection of evidence; but no such objection was made by either side, by exception to the report, filed in the court of chancery, and consequently no question of that character can be heard. The statute is peremptory that no such question shall be heard in this Court, unless the objection is made by exception to the report, duly filed in that court. P. S. 1268. And this statute is construed to be alike applicable when the cause is heard before a chancellor. *Barber* v. *Bailey*, 86 Vt. 219, 84 Atl. 608, 44 L. R. A. (N. S.) 98; *Rowley* v. *Shepardson*, 90 Vt. 25, 96 Atl. 374; *Osha* v. *Higgins*, 90 Vt. 130, 96 Atl. 700.

Defendants filed 18 exceptions to findings of fact; but the plaintiff urges that these exceptions should not be considered

because, as shown by affidavits, neither the company nor any of its solicitors received a copy of the exceptions, nor had any knowledge or notice that they had been filed, prior to the time when a copy of defendants' brief was received in exchange for a copy of plaintiff's brief, late Sunday afternoon, a week and two days before the case was argued in this Court. The affidavits do not show that at the time of filing the exceptions a copy thereof was not left with the clerk of the court for the adverse party, as required by Chancery Rule 47. By Rule 46 it was the duty of the clerk, when these exceptions were filed, forthwith to notify the plaintiff or its solicitors of such filing. According to the affidavits, this was not done. Such negligence on the part of the clerk being shown, we .cannot say that it was not due to his neglect also that plaintiff or its solicitors did not receive a copy of the exceptions. In these circumstances, it would be doing the defendants an injustice to deprive them of the benefit of their exceptions on the ground stated, when, so far as appears, the fault was not theirs.

The transcript of testimony was not made a part of the chancellor's report. It was referred to by the defendants in their exceptions and made a part thereof; but this does not bring it before us. *Royce* v. *Carpenter*, 80 Vt. 37, 66 Atl. 888; *Child* v. *Pinney*, 81 Vt. 314, 70 Atl. 566; *Barber* v. *Bailey*, cited above.

Exceptions 10, 11, and 13, not being briefed, are waived. Exceptions 1, 4, 5, 7, 8, 9, 12, 14, 15, 16, and 17, involve the examination and consideration of evidence not before the court; hence we cannot say that the evidence did not support the findings. *Fraser* v. *Nerney*, 89 Vt. 257, 95 Atl. 501.

Exception 2 is to the finding that the deed from Walter W. Fant to the plaintiff is a warranty deed, for that its legal character is a question of law, not of fact; and exception 3 is to the finding that the deed from Phœbe J. Bardin to Charles H. Barbour is a quitclaim deed, on the same ground. We give these two exceptions no consideration; for, if it be conceded that in each instance the court was wrong, the defendants were not harmed thereby in the view we take of the case.

Exception 6 is to the language in article 70 of the findings, "unless there was something in the record title to put the orator upon notice at the time it bought of Fant, of a claim by the adjoining owner on the south to a line north of the present 'pin line,' there was nothing sufficient to give it such notice," for

that the matter there stated is a question of law and not of fact, and the determination of what is sufficient to give such notice is a question of law for the court upon all the facts in the case. However this may be, the disposition we make of the case renders ·the question here raised immaterial.

The question presented by exception 18 is determined below.

Findings to which no exception was taken show that the lands between which is the divisional line in question, were formerly owned by Andrew J. Mead, under whom, as common grantor, through divers conveyances, both the plaintiff and the defendants claim their titles, going back to the same day, September 29, 1866; that there is no dispute as to the location of Mead's north line, it being correctly shown in plaintiff's plan, Exhibit 118, dated September, 1914. The record shows that the stone wall mentioned in the deeds from the common source and made the easterly boundary of the lands thereby conveyed (as far as the wall extends), now owned by the plaintiff and by the defendants, respectively, and between which the location of the line is now in dispute, is still there. This wall may well be treated as a permanent object in its original location on the ground. The deeds and the decrees in the chain of title of each of the parties, were made exhibits in the case, and are before us as a part of the chancellor's report.

On September 29, 1866, Andrew J. Mead gave a bond for a deed of a certain part of his farm, particularly describing it, in favor of Horace G. Clark, Alanda W. Clark, Norman Clark, Gardner L. Gates, and Hiram L. Briggs, giving them and their assigns the right to enter upon the premises for the purpose of opening, developing, and working any and all marble quarries thereon, within the time therein limited. At the same time Mead gave a bond for a deed of another certain part of his farm, particularly describing it, in favor of Willard N. Oliver, Horace G. Clark, Alanda W. Clark, and Norman Clark, giving them similar rights as to entering upon the premises for the purpose of opening, developing, and working marble quarries thereon, within the time therein limited. Within a few days after the giving of these bonds, they were recorded in the town clerk's office of the town in which the land is situated. On January 1, 1869, Mead and his wife gave a warranty deed in favor of the obligees in the bond first mentioned, the description therein of the land conveyed being identically the same as the description in that bond,

complete in itself, and as follows (we number the calls for convenience) : (1) ''Commencing at a point on the first stone wall west of the highway leading past the premises of the said Mead, 10 rods south of said Mead's north line, the north end of said stone wall being 55½ rods westerly from said highway and said point being on said stone wall 10 rods south of said Mead's north line; (2) thence southerly on said wall 10 rods; (3) thence westerly parallel with said Mead's north line 56 rods to a stake and stones; (4) thence northerly at right angles with said last-mentioned line to a point 10 rods south of said Mead's north line; and (5) thence easterly to the place of beginning.'' Through this deed the plaintiff traces its chain of title from the common grantor; and in the successive subsequent conveyances, the description of the land is the same as the foregoing, either given in full, or by reference to this deed.

On the same day Mead and his wife gave a warranty deed in favor of the American Marble Company, the description therein of the land conveyed being identically the same as the description in the bond secondly above mentioned, complete in itself, and as follows (we number the calls for convenience) : (1) ''Commencing at a point on the first stone wall west of the highway leading past the residence of said Mead 20 rods south of said Mead's north line, the north end of said stone wall being 55½ rods westerly from said highway, and said point being on said stone wall 20 rods from said Mead's north line; (2) thence southerly on said stone wall to the end of the same and thence southerly on the fence that joins onto the same in all 20 rods to a maple tree; (3) thence westerly 56 rods to a stake and stones; (4) thence northerly at right angles with said last-mentioned line to a point 20 rods south of said Mead's north line; and (5) thence easterly in a line parallel with said Mead's north line to the place of beginning.'' Through this deed the defendants trace their chain of title from the common grantor; and in the successive subsequent conveyances, the description of the land conveyed is the same as the foregoing, either given in full, or by reference to this deed, or to some other deed in the chain of title.

The question arises as to the true interpretation of the boundaries contained in these two deeds from Mead. Mead's north line runs practically east and west. The stone wall mentioned extends from this north line somewhat southwesterly for a distance of approximately 22½ rods. No uncertainty in the

description so far as the reading of the deeds goes, is claimed. And the only part of the boundary contained in the deed in the plaintiff's chain of title, concerning which any real question can arise as to its meaning when applied to the land, is the point of commencement: whether this is to be found by measuring at right angles (practically south) from said north line at a place where such a measurement of 10 rods just meets the stone wall, or by measuring that distance from said north line, along the stone wall. The plaintiff's plan, Exhibit 118, drawn to a scale, shows that the right-angled triangle, having for its perpendicular a line 10 rods long drawn from said north line south to the point of its meeting the stone wall, and for its hypotenuse a line drawn from this point of meeting, along the wall to said north line, has its base on this north line, approximately 35 feet long. There is nothing in the deed indicating that the hypotenuse line, running to such an extent southwesterly, rather than the perpendicular line running practically south, is the course of measurement from the north line mentioned, in locating the point of beginning.

It is a rule of construction that where a boundary line is described as running toward one of the cardinal points of the compass it should be considered as running directly in that course, unless some other word or words are used for the purpose of qualifying its meaning, or its direction is controlled by some object. *Sowles* v. *Minot*, 82 Vt. 344, 73 Atl. 1025, 137 Am. St. Rep. 1010; *Jackson* v. *Lindsey*, 3 Johns. Cas. (N. Y.) 86; *Brandt* v. *Ogden*, 1 Johns. (N. Y.) 156; *Hagan* v. *Campbell*, 8 Port. (Ala.) 9, 33 Am. Dec. 267; *Fratt* v. *Woodward*, 32 Cal. 219, 91 Am. Dec. 573. In *Currier* v. *Nelson*, 96 Cal. 505, 31 Pac. 531, 31 Am. St. Rep. 239, this rule was applied, as in the instant case, in interpreting the language of the boundary as to the point of commencement. There the first descriptive call in the deed was, "Commencing at a point on the northwesterly line of" the street named, so many "feet north of the northeasterly line of" another street named, and the court was called upon to determine the meaning of the word "north" as there used. The word was held to mean due north, unless qualified or controlled by other words, and this was its meaning in the deed under consideration.

In the case at bar, if the intention had been to fix the point of beginning at the distance given southerly of Mead's north line, measured along the wall, it was easy to indicate in language plainly to that effect, the same as was done in the second call,

"thence southerly on said wall 10 rods." There the words "on said wall" show that the course of the line is controlled by the course of the wall. In *Park* v. *Pratt,* 38 Vt. 545, the line was described as beginning "on the south line of land owned by Lafayette Lyon," and running "east 15 degrees south on said Lyon's line," etc. The referee found that the true divisional line ran 13¾ degrees south, instead of 15, on Lyon's line, so that the difference between the course of Lyon's line and the line as described by the compass in the deed, was 1¼ degrees. It was held that "On said Lyon's line" was the controlling description, and that this made Lyon's land an abuttal, a boundary, and in effect the same as if the deed had bounded the land granted, north by Lyon's land.

The distance of this course being definitely stated in the deed, without any monument as its termination, the course and distance must govern. *Bagley* v. *Morrill,* 46 Vt. 94; *Grand Trunk Ry. Co.* v. *Dyer,* 49 Vt. 74. And the call requires the line to be 10 rods long from the point of commencement named in the deed. *Owen* v. *Foster,* 13 Vt. 263; *Day* v. *Wilder,* 47 Vt. 583.

The importance of right conclusions regarding the first and second calls is readily seen when we observe their controlling effect upon the third call, the line in dispute so far as it rests on the plaintiff's title deeds. The third call requires the line to run westerly from the southerly terminus of the 10-rod line of the second call, parallel with Mead's north line 56 rods to a stake and stones. By the course there given, the land conveyed has a uniform width north and south, corresponding with its width at the easterly end; and answering the fourth call, "thence northerly at right angles with said last mentioned line to a point 10 rods south of said Mead's north line," and the fifth call, "thence easterly to the place of beginning," the land between the last named line and Mead's north line is of the same width, throughout, as at the east end where the measurement of 10 rods south from this north line is to be made in locating the point of commencement.

The language of this deed, interpreted in connection with, and in reference to, the nature and condition of the subject-matter of the grant at the time the instrument was executed, and the obvious purpose the parties had in view, is clear and unambiguous, its meaning is a question of law for the court, and

the intent cannot be altered by evidence, or findings, of extraneous circumstances. *Crosby* v. *Montgomery,* 38 Vt. 238. The language being clear and unambiguous, the deed is to be interpreted by its own language, and the court is not at liberty to look at extraneous circumstances for reasons to ascertain its intent; and the understanding of the parties must be deemed to be that which their own written instrument declares. *Smith* v. *Fitzgerald,* 59 Vt. 451, 9 Atl. 604; *Clement* v. *Bank of Rutland,* 61 Vt. 298, 17 Atl. 717, 4 L. R. A. 425; *Marsh* v. *Fish,* 66 Vt. 213, 28 Atl. 987; *New York Life Ins. & Trust Co.* v. *Hoyt,* 161 N. Y. 1, 55 N. E. 299.

It is to be borne in mind that on the day of giving the deed just examined, Mead also gave the deed (to the American Marble Company) under which the defendants derive title from the common source. The boundaries in the two deeds are so essentially alike in form as to the first call, and as to the course required by the second call, that the legal interpretation of the first one mentioned, in these respects, is for the same reasons the legal interpretation of the other also: the point of commencement on the stone wall is to be found by measuring at right angles south from Mead's north line, at the place where such measurement of 20 rods just meets the stone wall; and by the second call, "thence southerly on said stone wall to the end of the same and thence southerly on the fence that joins onto the same in all 20 rods to a maple tree," the course of the line follows the course of the wall, and the course of the fence, terminating at the maple tree. The length of this course is discussed further on. The northerly terminus of the line answering the fourth call, "a point 20 rods south of said Mead's north line," is definitely fixed as at a specific distance south of an object concerning the location of which there was, and is, no misunderstanding. The fifth call requires not only a line easterly to the place of beginning, but one that is parallel with said north line. This indicates a purpose to make it doubly sure that the north line of the property conveyed shall be throughout the same specified distance, measured at each end, south of Mead's north line; for, unless it be made conformable thereto in its location on the ground, its parallelism must be wanting. *Graves* v. *Mattison,* 67 Vt. 630, 32 Atl. 498. The description contained in this deed, like that contained in the other deed from Mead, of the same date, is definite, certain, unambiguous; and hence we interpret it, as a matter of law,

without noticing any extrinsic evidence (by way of exhibits before us) introduced on the basis of defendants' claim of latent ambiguity, or any extrinsic facts reported. Thus it is seen that the north line of the premises conveyed in the deed from Mead, in the defendants' chain of title, in no wise conflicts with the south line of the premises conveyed from the same source, in the plaintiff's chain of title. The fact that by such interpretation of these two deeds there may be a very narrow strip of land between the properties conveyed, consequent on the fact that the width of plaintiff's land is governed by its east line of 10 rods measured from the point of beginning, southerly *on the wall,* instead of at right angles with Mead's north line, cannot affect the legal meaning of either instrument.

Deeds, surveys, and plans not referred to in a deed in question, can neither restrict nor extend the import of the terms used. *Butler* v. *Gale,* 27 Vt. 739. So far as this case is concerned, however, such narrow strip is to be considered as a part of defendants' grant; for not only is such the effect of the allegations in the bill, admitted in the several answers of defendants, but it is manifest that this is according to the practical construction which has always been given to the deeds through which defendants trace their title, in their application to the land itself.

The location of the divisional line on the land was a question of fact to be determined on the evidence. *Grand Trunk Ry. Co.* v. *Dyer,* cited above. As a part of his findings the chancellor states that on the west side of the stone wall which runs along the east side of the land of the plaintiff and of the land of the defendants, there is now a marble post about 4 inches square, substantially 10 rods south of the north line of the Mead farm, and shows above ground; that there is another such post on the same side of the same wall, substantially 10 rods measured southerly along the wall from the first post, and standing several inches above ground; that there is another such post about 56 rods west of the last, measuring in a line substantially parallel with Mead's north line, also standing several inches above ground; that there is another such post north of the one last mentioned, substantially 10 rods south of Mead's north line; that these posts were put there before 1890; that there is now in the ledge three iron pins in a line between the southerly marble posts mentioned, which iron pins are three-fourths of an inch in diameter, and are driven firmly into the ledge, standing 4 or 5 inches above it. The

line of these two southerly marble posts and the three iron pins is marked on plaintiff's plan, Exhibit 118, as the "pin line." In 1890 these marble posts and iron pins appeared the same as they do now, and did not have the appearance of having been recently put there.

"On the findings," as reported by him and in connection therewith, the chancellor states, "the decision is that the line between the two properties involved in this case is the so-called 'pin line.'" This statement seems to be considered in defendants' brief as a conclusion of law; but such consideration is hardly warranted. It devolved upon the chancellor, as before indicated, to determine as a fact the location of the true divisional line on the ground itself. Without doubt this is what he undertook to do, as he well might, by drawing an inference to that effect from the other facts reported, and in this sense used the word "decision." "A *decision* of the court is its finding upon a question of law or fact arising in a case." See quotation given in Webster's International Dictionary; *Froman* v. *Patterson,* 10 Mont. 107, 24 Pac. 692; *Wilson* v. *Vance,* 55 Ind. 394; *Gates* v. *Baltimore, etc., R. Co.,* 154 Ind. 338, 56 N. E. 722; *Corbett* v. *Twenty-Third St. R. Co.,* 114 N. Y. 579, 21 N. E. 1033. The conclusion of law is stated by the chancellor in appropriate language in the decree: "It is hereby ordered, adjudged and decreed that the line dividing land of the orator from land of defendants * * * is the line marked by three iron pins * * * in the marble ledge and marble monuments at the east and west ends. * * *" This in effect disposes of defendants' eighteenth exception to findings.

It is said by the defendants that the original bonds and the deeds following them by which the land of the defendants and the land of the plaintiff were carved out of the lands of Mead, by their terms placed the boundary line between them, that is, the north line of defendants' land 20 rods north from the maple tree (a known monument at which defendants' land corners) and 20 rods south of the north line of Mead's farm (a known monument not on or adjacent to any of the land in either bond or the deed following it) ; that, so far as the reading of the bonds and deeds goes, this description is clear, and not ambiguous; but upon applying them to the land it at once appears that the distance between the maple tree and the north line of Mead's farm is only 36 rods 6½ feet. Consequently (it is further said) the north line of the land bonded to Oliver and others, and conveyed to the

American Marble Company in the formation of which they were associated, could not be both 20 rods north from the maple tree and 20 rods south from Mead's north line; and so here is a latent ambiguity to cure which resort may be had to extrinsic evidence.

The description contained in the bond is not different from that contained in the deed. It appears (from the plaintiff's plan, Exhibit 118) that the length of the course required by the second call in the deed, the southerly terminus of which is given as the maple tree, is about $1\frac{8}{10}$ rods shorter than the distance stated in the deed. Yet this discrepancy, appearing in the application of the description to the land, does not constitute a latent ambiguity. The maple tree is a natural object then and now on the ground, directly in the course and made to mark the southeasterly corner of the land conveyed; and there is nothing by reason of which the description in this respect is taken out of the general rule, that as between courses and distances on the one hand, and abuttals and monuments on the other, abuttals and monuments, when identified, must control, the reason of the rule being that mistakes in courses and distances are more probable and more frequent than in abuttals and monuments capable of being clearly designated and accurately described. *Bundy* v. *Morgan*, 45 Vt. 46; *Fullam* v. *Foster*, 68 Vt. 590, 35 Atl. 484; *Sowles* v. *Butler*, 71 Vt. 271, 44 Atl. 355. Moreover, it is erroneously said that the second call in the deed in terms places the north line of defendants' land 20 rods north from the maple tree. As already observed, this call requires the course to be *southerly* along the wall and along the fence extending from the end of the wall, the distance given being of the course going in the direction stated, which by rule of construction is limited by the location of the natural object (maple tree) designated as the terminus.

The place of beginning being well known and well ascertained, it must govern, and the grant must be confined within the boundaries given in the deed. *Gilman* v. *Smith*, 12 Vt. 150. And there being no uncertainty in the description, to locate the lines the regular order of the calls should be observed and followed; and a posterior line cannot be controlled by a reverse survey. *Tucker* v. *Satterthwaite*, 123 N. C. 511, 31 S. E. 722.

It is contended by the defendants, however, that the dividing line as now claimed by them was established by recognition and acquiesced in by the owners of the land on both sides for more

than 15 years, and that the owners and occupants of defendants' lot occupied and used the land in question, treating it as their own, in which occupancy, use, and treatment of the lot to this line, the plaintiff and its predecessors in title acquiesced, sometimes expressly, sometimes by inaction and license, for the entire period from 1866 to 1911, 45 years. This raises the question of title in the defendants by adverse possession of the strip of land between the true divisional line as found and adjudged by the chancellor and the line now claimed by them.

This action does not involve the reformation of any instrument of conveyance given by Mead; and it can serve no good purpose to conjecture why, in making the description of the land in the bonds and in the deeds given pursuant to the bonds, the survey and the plan made by Brown were not followed. The departure therefrom in each instance is so material and so marked as to indicate a change of purpose. The descriptions adopted show unusual care and precision in their framing. Whatever may have been previously done or said by the parties to the transactions, relative to that survey and plan, such acts and declarations were merged in the written instruments subsequently executed on the one hand and accepted on the other; and neither the survey nor the plan can have any force in this case, beyond what bearing it may have, if any, by reason of its subsequent use by the parties in connection with the asserted recognition of, or acquiescence in, the line now claimed by defendants. Extrinsic evidence is not admissible to show that, by mistake, one tract of land instead of another was inserted in either of those deeds, thereby really establishing a different contract. *McDuffie* v. *Magoon,* 26 Vt. 518; *Pitts* v. *Brown,* 49 Vt. 86, 24 Am. Rep. 114.

After the giving of the bonds, there was no survey made of the premises until July, 1873, when the Green survey was made as shown in the statement of the case. It is manifest that in making this survey no attempt was made to follow the boundaries contained in either of the deeds from Mead, nor even to locate the point of beginning according to the requirements in either. The whole purpose was to establish the corners and follow the boundaries as shown by the Brown survey and the plan made pursuant thereto. That this is so, and that the description in the respective deeds did not correspond therewith, appear from the plan made by Green (Defendants' Exhibit 39), where-

29

on it is stated: "July 29, 1873, boundaries, corners, measurements, and notes made herein are agreed to and witnessed as correct"—being signed by Mead, Marcellus Newton, and Charles Woodhouse; and from the statement made and signed by H. G. Clark in connection therewith, wherein he states that: "Whereas, in both deeds [from Mead] it has since been found out that the way in which the said parcels [of land] were described in the records is not equivalent to the parcels as originally laid out and marked by one Jas. Brown and agreed to by the said Mead and ourselves. Now, therefore, * * * I hereby agree that the said properties shall be and remain as originally laid out by said Brown, and that the survey by one G. E. Green signed by A. J. Mead and M. Newton on July 29, 1873, * * * is accordingly correct and satisfactory to us." The notes (on Green's plan) agreed to as stated above are particularly significant to the same effect. Furthermore, when making his survey, Green called to the attention of Woodhouse, Clarks, and Mead, the fact that the calls in deed did not correspond with the monuments and objects on the land.

Thus it is seen, and by intendment it will be taken that the chancellor found, that the line which defendants contend was then recognized and thenceforth acquiesced in by the successive owners and occupants on each side thereof for a period of more than 15 years, was not then understood to be, and is not, the south line of the land now owned by the plaintiff, as described in its title deeds, nor the north line of the land now owned by the defendants, as described in their title deeds. But it was then understood to be, and is, another line which is 3 rods and 7½ feet further north and only 16 rods and 9 feet south of Mead's north line, which increases the size of defendants' quarry lot approximately 1½ acres from what it is according to their paper title. We need not discuss the rule where the true divisional line between lands of adjoining owners, according to the calls in their respective deeds, is uncertain and in doubt, and its location is agreed upon and established by parol as the line to which the title of each extends, followed by the acquiescence of such owners, for that is not this case. Here, it having been ascertained that the two parcels of land described in the two deeds mentioned were "not equivalent to the parcels as originally laid out and marked" in Brown's survey, an attempt was made some years afterwards, by some of those (at least) who participated therein,

to extend the title of defendants' grantors northerly by establishing the divisional line as marked by Brown and by Green on their respective plans.

The statements before mentioned made and signed in connection therewith were not sufficient as a memorandum to answer the requirements of the statute of frauds. They do not contain the substantial terms of any contract for the sale of land, or of an interest in land, expressed with such certainty that they may be understood from the contract itself, or some other writing to which it refers, without resorting to parol evidence. *Buck* v. *Pickwell,* 27 Vt. 157; *Adams* v. *Janes,* 83 Vt. 334, 75 Atl. 799.

The so-called recognition of, and acquiescence in, this line is without force, unless followed by such possession of the land north of the true divisional line and up to the line thus recognized for the period of 15 years, as shall give a perfected title by adverse possession. *Lewis* v. *Ogram,* 149 Cal. 505, 87 Pac. 60, 10 L. R. A. (N. S.) 610, 117 Am. St. Rep. 151; *Vosburgh* v. *Teator,* 32 N. Y. 561.

It is urged that the facts found show that the American Marble Company occupied the land up to this line, though previous to the date last named; and that this occupancy, as well as the similar occupancy by the successive subsequent owners of the land within the defendants' grant, is to be considered in determining defendants' ownership by adverse possession of the land mentioned without their grant. Yet this position cannot be sustained. Neither the American Marble Company nor any of its successors, had any color of title to the strip of land in question; and it is observable from the statement of the case, that of such successors none prior to the defendants ever occupied that strip, unless it may have been in the way of dumping refuse from the quarry now owned by defendants, or by placing marble blocks on the land. Whatever occupancy that company, or its successors in the way mentioned, had of the land, there is no finding that the occupancy by any of them was under a claim of right. Their several possessions, therefore, do not appear to have been adverse. *Demeritt* v. *Parker,* 82 Vt. 59, 71 Atl. 833. Indeed, in 1884-85 Bardin, then the record owner of the land south of the dividing line, wrote his son (who was operating the quarry), "We want our lines established as our deeds and titles specify"; and that he thought the correct way to have the quarry lot surveyed was to "run out the line from *starting point* and

plant your corners as the title reads, and if Mr. Mead is not satisfied, let him move them by law." See *Day* v. *Wilder*, 47 Vt. 583, 593, 594.

But if the record before us be construed as showing such possession to have been severally adverse, as defendants urge, the result is the same. The land so adversely held has never been covered by the description of the land contained in any of the deeds within the defendants' chain of title. Nor is it found that each prior successive grantee, in writing, or by parol agreement or understanding, transferred to his successor, his possession of said land without the calls of his title deeds accompanied by an actual delivery of the possession of the premises. No privity of estate or of possession between the successive disseisors is shown. Without some privity between them, the several possessions cannot be tacked so as to make continuity of possession. *Winslow* v. *Newell*, 19 Vt. 164; *Sheldon* v. *Michigan Cent. R. Co.*, 161 Mich. 506, 126 N. W. 1056; *Illinois Steel Co.* v. *Budzisz*, 106 Wis. 499, 81 N. W. 1027, 82 N. W. 534, 48 L. R. A. 830, 80 Am. St. Rep. 54; *Rich* v. *Naffziger*, 255 Ill. 98, 99 N. E. 341. Since there was no privity, upon the termination of the possession of each disseisor, the seisin of the true owner revived and was revested, and a new distinct disseisin was made by each successive disseisor. *Sawyer* v. *Kendall*, 10 Cush. (Mass.) 241; *Wishart* v. *McKnight*, 178 Mass. 356, 59 N. E. 1028, 86 Am. St. Rep. 486.

Regarding the placing and maintaining of guys and ropes or cables on the land north of the true divisional line, by the defendants' predecessors in title, it is enough to say that such acts are not found to have been under a claim of right; and consequently, for reasons already stated, they cannot be considered on the question of a prescriptive right in the nature of an easement in favor of defendants' land, as the dominant tenement, to such use of the land first named, as the servient tenement.

The defendants' ownership of their quarry lot began May 29, 1903. Hence in point of time they cannot, of themselves, have acquired any adverse rights in or to the land north of the dividing line between their land and the land of the plaintiff, as found and adjudged by the chancellor.

*Decree affirmed, and cause remanded.*

## ON MOTION FOR REARGUMENT.

WATSON, J.   The foregoing opinion being promulgated, the defendants moved for leave to reargue the case and were permitted to file a brief upon that motion, the plaintiff to have leave to submit a brief in reply.

It is said in defendants' brief so submitted that the opinion shows that the Court understood that the two deeds from the common grantor (dated January 1, 1869) do not refer to each other, and that their construction must be separate and distinct because of that fact, citing *Butler* v. *Gale*, 27 Vt. 739, and that this would seem to be a misunderstanding of the Court where it recites the description in each of the deeds.   In each instance it states that the description is "complete in itself."   Whereas "in the case at bar each of the deeds refers to the other," says the brief, "and makes one property an abutter of the other."   We are here referred to the findings, articles 1 and 2, also to orator's Exhibits C and O.   Articles 1 and 2 relate exclusively to the giving of the two bonds for deeds of the properties now owned by the plaintiff and by the defendants, respectively.   These findings say nothing as to the relative situations of the properties described in the bonds; but the bonds are made exhibits in the case, and the description of the land now owned by the plaintiff, as contained in the bond marked Exhibit C, and as contained in the deed subsequently given by Mead in performance of the provisions of that bond, is correctly copied into the opinion, except in the latter the calls are numbered for convenience.   After the description this bond contained a clause as follows: "And the said Mead also hereby further agrees to convey at the same time * * * the right of way across his land from the highway to said premises to the said Horace G., Alanda W., Norman, Gardner L., and Hiram L., their heirs and assigns, in common with Willard N. Oliver, the said Horace G., Alanda W., and Norman, they having this day taken a bond for a deed of the piece of land south of and adjacent to said premises."

The other bond, Exhibit O, contains the description of the land now owned by the defendants, exactly as contained in the deed subsequently given by Mead in performance of the provisions of that bond, and as copied into the opinion (excluding the numbers of the calls as in the other instance).   This bond then contained a clause as follows: "And the said Mead also hereby

further agrees to convey at the same time * * * the right of way across his land to said premises from the highway to the said Willard N., Horace G., Alanda W., and Norman, their heirs and and assigns, in common, with the right of the said Horace G., Alanda W., Norman, and one Gardner L. Gates to the use of said water, the said Mead having this day executed a bond to them the said Horace G., Alanda W., Norman, and Gardner L. Gates, thereby agreeing to convey to them upon certain terms therein mentioned the piece of land north of and adjacent to said premises.''

Neither the recital in the bond first mentioned, that the parties named ''having this day taken a bond for a deed of the piece of land south of and adjacent to said premises,'' nor the recital in the bond last mentioned that ''Said Mead having this day executed a bond to them'' [the obligees named in the other bond] ''thereby agreeing to convey to them * * * the piece of land north of and adjacent to said premises,'' was any part of the description of the land thus mentioned. Moreover, the words ''adjacent to'' do not necessarily imply ''adjoining'' or ''contiguous.'' Mr. Webster says ''objects are adjacent when they lie close to each other, but not necessarily in actual contact.'' To the same effect is *Bacon* v. *Boston & Maine R. R.*, 83 Vt. 528, 77 Atl. 858. In each bond the recital was general and only a statement showing why the right of way agreed to be granted for the benefit of the premises therein described, was to be in common with a like use agreed in the other bond, to be granted for the benefit of the premises therein described. The statement thus made in either bond was not intended to affect the description of the premises previously made in that instrument, and is not to be used for such purpose. *Grand Trunk Ry. Co.* v. *Dyer*, 49 Vt. 74.

But there is another well-established principle of law by which the recitals quoted above from the bonds cannot be considered in the interpretation of the deeds. The bonds were executory contracts for deeds, and were executed and consummated by the deeds subsequently given on January 1, 1869. Neither of the deeds so given contains any such recital, and neither makes any reference to the bond in performance of the provisions of which it was given. In each instance the deed was delivered and accepted as performance of the previous contract to convey, and therefore the contract was conclusively merged in the deed, and even though the terms of the deed may vary from those contained

in the contract, the deed, so far as its construction is concerned, must be looked to alone to determine the rights of the parties. In *Carter* v. *Beck,* 40 Ala. 599, it was held that the acceptance of a deed is considered as a full compliance with the contract to convey, and as annulling it.   In *Howes* v. *Barker,* 3 Johns. (N. Y.) 506, 3 Am. Dec. 526, it is said: "The contract between the parties, according to the articles of agreement, (under their hands and seals,) was executory, and, having been executed, and consummated, by the deed subsequently given, the agreement became null and of no further effect."

In *Slocum* v. *Bracy,* 55 Minn. 249, 56 N. W. 826, 43 Am. St. Rep. 499, it is said: "No rule of law is better settled than that, where a deed has been executed and accepted as performance of an executory contract to convey real estate, the contract is *functus officio,* and the rights of the parties rest thereafter solely on the deed." And that, "This is so although the deed thus accepted varies from that stipulated for in the contract."

To the same effect are *Kerr* v. *Calvit,* Walk. (Miss.) 115, 12 Am. Dec. 537; *Timms* v. *Shannon,* 19 Md. 296, 81 Am. Dec. 632; *Portsmouth, etc., Refining Co.* v. *Oliver Refining Co.,* 109 Va. 513, 64 S. E. 56, 132 Am. St. Rep. 924; 2 Devlin on Real Est. (3rd Ed.) § 950a.   Such a contract, not referred to, cannot contradict or control the operation of the deed.   *Clifton* v. *Jackson Iron Co.,* 74 Mich. 183, 41 N. W. 891, 16 Am. St. Rep. 621.   Nor is the general rule any different where the previous contract was in the form of a bond conditioned for the conveyance of the property, as in the case at bar.   *Shontz* v. *Brown,* 27 Pa. St. 123; *Manspeaker* v. *Pipher,* (Kan.) 48 Pac. 868; 2 Devlin on Real Est., cited above.   The foregoing general principle is the same as has been declared by this Court regarding the merger of prior parol agreements when a deed or other written instrument has been subsequently executed, delivered, and accepted.   *Smith* v. *Fitzgerald,* 59 Vt. 451, 9 Atl. 604; *In re Perkins' Estate,* 65 Vt. 313, 26 Atl. 637.

It is said by defendants in their brief for reargument that the language of the opinion "is such as to show that the matter lies in the mind of the court as if the plaintiff's title to its property were prior in origin, or at least contemporaneous with the defendants' title." And that "this must be a misapprehension, for the defendants' title (equitable title at least) begins in an instrument on record six days before the plaintiff's." It is true

that the Court did understand when writing the opinion, and it understands now, that the rights given by the common grantor by his two bonds mentioned, were contemporaneous. The bonds bear the same date, they purport to have been acknowledged by the grantor before the same justice of the peace on the same day, and the chancellor found that they were given "at the same time." Exception was taken to this finding for that it "is not supported by the evidence and is contrary to the evidence." It is said in defendants' brief for reargument that the determination of this question "does not require examination and consideration of evidence not before the court, but of the findings of fact made and filled by the chancellor."

The chancellor has not reported on what evidence he made that finding. Parol evidence was admissible to show the true time of the giving of each bond. 4 Wig. Ev., § 2410; *Bellows* v. *Weeks,* 41 Vt. 590; *Wilmot* v. *Lathrop,* 67 Vt. 671, 32 Atl. 861. It does not appear that such evidence was not before the chancellor, and we cannot, for the purpose of finding error, assume that the evidence did not support the finding. *Hyde* v. *Swanton,* 72 Vt. 242, 47 Atl. 790. The evidence, other than exhibits, not being before us, it does not appear that the finding was not made upon sufficient evidence. *Sowles* v. *Hall,* 73 Vt. 55, 50 Atl. 550. In the circumstances shown, including the fact that some of the obligees in the two bonds were the same persons, and the further fact of the recital in each bond, noticed above, there can be no doubt that each set of obligees, when receiving the bond to them, had knowledge of the giving of the other bond. It should be borne in mind that every reasonable intendment is to be made in favor of the decree under review. The fact that one of the bonds was placed on record before the other, gives it no priority as a contract for title. *Hill* v. *Murray,* 56 Vt. 177.

It is further said in defendants' brief for reargument that the Court in its opinion states that the description in defendants' deed, like that in the plaintiff's, is definite, certain, unambiguous, and therefore it is interpreted as a matter of law without noticing exhibits or extrinsic facts reported. In that connection defendants state it to be their belief that further discussion must make it clear to the Court "that the existence of a monument on the land, placed there and understood by all the parties as marking the 'point' of beginning of the description, is not extrinsic matter, but must be considered, as a matter of law, in connection with

and in reference to the nature and condition of the subject-matter of the grant at the time the instrument was executed, and the obvious purpose which the parties had in view''; and that, ''so interpreting the deed, with the fact found that a monument was actually set by the parties to designate the 'point' of beginning described in the deed, in applying the description to the land it must start at that monument.'' Again it will be seen that this claim that ''a monument was actually set by the parties to designate the 'point' of beginning described in the deed,'' is not borne out by the record, not if ''by the parties'' is meant, as the language indicates, *all* the parties to the proposed purchase or purchases. The findings show that, ''in the fall of 1866, negotiations having been entered into between Andrew J. Mead and prospective purchasers of the quarry property,'' on September 26, 1866, the Brown survey was made ''at the request of Mead and Alanda W. Clark, one of the prospective purchasers''; that, ''accompanied and directed by said Alanda W. Clark and Mr. Mead and his son, Eugene, Mr. Brown'' made this survey; that Mead paid Brown for his services, and Alanda W. Clark paid for a team for his use. It is further found that on the next day a rough sketch or plan of the premises was prepared, and Mead made and retained a copy of it for himself, showing in detail the boundaries, corners, monuments, and distances, and containing complete directions for drawing the conveyances as shown thereon; that ''No survey or measurement except on the 20-rod parcel and the 90-rod piece had been made at that time, except to measure off the width of the '10-rod lot B.' '' But the findings do not show that any of the other prospective purchasers (who became obligees in the bonds for deeds) had anything to do with causing or authorizing the Brown survey and plan to be made, nor that any of them thereafter ratified this survey or plan, except the statement made in writing by Horace G. Clark on July 28, 1873, at the time the Green survey was made, which was 6 years and 10 months after the bonds were given, and more than 4½ years after the deeds of January 1, 1869, were delivered and accepted as performance of the contracts to convey. The defendants had the burden of proof upon the foregoing question, and, judged by the record, they failed to sustain it. As seen by the statement of the case, Brown, in making his survey, ''ran a line at right angles to the north line of the Mead farm northerly from the point where two fences corner at the north side of

a large maple tree.   On this line he measured off 20 rods and then set a stake; through this stake he ran a line parallel to the Mead-Blanchard line easterly to a stone wall where he set a stake, and westerly to an old fence running northerly and southerly and there set a stake.   From the stake first set he continued the right angle line northerly 10 rods and there set a stake, and from that stake ran easterly parallel with the Mead-Blanchard line to the said stone wall.   From the maple tree he ran westerly along the line of a board fence 56 rods to the north bar post of a bar-way then standing and there set a stake, and then turned a right angle to the north and ran a line to meet the line parallel with the Mead-Blanchard line.''

But the Brown survey and plan, not being participated in, authorized, or ratified by *all* the parties to either contract to convey, and not being referred to therein, nor in either deed of January 1, 1869, cannot be considered in the construction of either the bonds or the deeds.   *Sanborn* v. *Clough,* 40 N. H. 316; *Wells* v. *Jackson Iron Mfg. Co.,* 47 N. H. 235, 90 Am. Dec. 575. The case last cited is much in point.   The chief matter in controversy was the title to the summit of Mt. Washington, which the plantiffs claimed as owners of Thompson & Meserve's purchase, and the defendant as owner of Sargent's purchase.   The plaintiff introduced as evidence of paper title, a resolution of the Senate and House authorizing the Governor to appoint a land commissioner, whose duty it was to sell certain lands of the state and execute deeds therefor, a copy of the proceedings of the Governor and council nominating and appointing one James Willey land commissioner; and a copy of quitclaim deed from Willey to Thompson & Meserve, conveying a tract of land ''beginning,'' etc.   Thompson testified to a survey made by him and Willey after negotiations between them for the sale, and a few days before the date of the Willey deed, and that their object was to fix the bounds of the land to be conveyed.   The court said that the prior negotiations must be taken, so far as the construction of the deed was concerned, to have been merged in that instrument, the conclusive presumption being that the whole engagement of the parties, and the extent and manner of it, were reduced to writing; that the deed contained no reference to any monument established by Thompson and Willey, or to any survey by them, and the effect of the evidence, at most, could be merely to show that Willey and Thompson intended a different tract of

land from that afterwards conveyed by the deed, if the lines of their exploration were found to differ from the calls of the deed, and its reception to control the deed would be in violation of a principle quite elementary; that, "besides, Meserve, who was one of the grantees in the deed, was not a party to this transaction by Willey and Thompson, and there is no evidence that he ever authorized or ratified it: *Prescott* v. *Hawkins,* 12 N. H. 27. This evidence was therefore incompetent to affect the construction of the deed."

It follows that since all the parties in interest did not cause or authorize the Brown survey to be made, nor ratify it, the corners marked in the course of that survey, including the points of beginning, were not in a legal sense marked by the parties, and cannot be regarded as practical locations controlling the courses of the deeds or either of them.

It is further urged in the defendants' brief for reargument, as in their former brief, that the divisional line as claimed by them was subsequently recognized and acquiesced in by the parties, in other words, that the parties themselves, by their practical construction of the deeds, treated the location of the line as being where defendants now claim it to be. In connection with this claim particular reference is made to what they please to term by a misnomer, "the solemn declarations of Mead on the Green plan," that the northeast corner stake set by Brown correctly shows the place of the northeast corner of defendants' land. Notice was taken in the opinion of the so-called recognition and acquiescence of the divisional line as claimed by defendants, in connection with and consequent upon the resurvey and plan made by Green in July, 1873, and the statements placed on the plan, and the separate, written statement then made and signed by Horace G. Clark relating thereto, as far as was deemed necessary and proper in the determination of the case. But in view of the arguments put forth why the motion for reargument should be granted, we discuss here more fully the significance of that survey, including the matters connected therewith, as bearing upon the question of recognition and acquiescence presented. At the time when that resurvey and the plan were made, and when the notes on the latter were agreed to and signed, Andrew J. Mead owned a one-tenth undivided interest in the property now owned by the plaintiff. Horace G. Clark, Norman Clark, and Alanda W. Clark, owned the remaining nine-tenths interest

therein.   The property now owned by defendants was then owned, seven-sixteenths by Lyman Bardin, two-sixteenths by Stillman C. White, and seven-sixteenths by Isaac M. Hillman. The findings show that of the then owners of the property now owned by the plaintiff, only Mead had to do with the making, or the causing to be made, of this resurvey and plan; and of the then owners of the property now owned by defendants only Bardin had to do with the causing of that resurvey and plan to be made.   The record states that Green was employed to do this work "by both Mead and Bardin and each paid one-half of his charges therefor."   Furthermore, none of the other common owners of either property, except Horace G. Clark by his writing referred to above, ever authorized or ratified this survey or plan, so far as the case shows, and if the defendants claim otherwise the burden was on them to show it.   4 R. C. L. 126.   The conduct of Horace G., as president of the American Marble Company, is referred to by defendants in connection with their claim in this behalf, but there is nothing in the findings showing his conduct in the position named to have this effect as a matter of law.

The law is that an agreement by one of several co-owners establishing a doubtful or disputed boundary, is not binding on the others unless they consent thereto, and so as a general rule all the parties interested in the lands must be parties to the agreement.   9 C. J. 236; *Strickley* v. *Hill,* 22 Utah 257, 62 Pac. 893, 83 Am. St. Rep. 786; *Wright* v. *Willoughby,* 79 S. C. 438, 60 S. E. 971; *Smith* v. *Gilley* (Tex. Civ. App.) 135 S. W. 1107. See *Sawyer* v. *Coolidge,* 34 Vt. 303; *Silsby & Co.* v. *Kinsley,* 89 Vt. 263, 95 Atl. 634.

The finding that "Green discovered and called to the attention of Woodhouse, Clarks, and Mead the fact that the calls in deed concerning the boundary did not correspond with the monuments and objects on the land, and that the marble post marking the northwest corner of the 96-rod piece was 8 feet further south of the butternut tree than Brown had found and Mead's plan shows," is not sufficient to establish a practical location of the boundary line on the ground as against  Alanda W. Clark and Norman Clark, construing the word "Clarks" as including them, in the absence of proof that they agreed to the survey as establishing the correct line.   9 C. J. 243; *Hruby* v. *Lonseth,* 63 Wash. 589, 116 Pac. 26.   Nor in this respect is the standing of Alanda

W. Clark affected by the fact that he participated in the making of the Brown survey; for, as observed in the opinion, that survey was not followed by Mead in describing the properties to be conveyed, and whatever ·was previously said and done concerning the survey, was merged in the written instruments subsequently executed on the one hand and accepted on the other, and it can have no bearing in the case unless it was afterwards used by the parties in connection with the asserted recognition of, and acquiescence in, the line now claimed by the defendants. There is no finding that Alanda W. made any such use of it. At the time that survey was made he was one of the prospective purchasers of each piece of property, and became one of the obligees in each bond for a deed. At the time of the Green resurvey he was interested only in the property now owned by the plaintiff. This shows a reason why, at the latter time, he may not have been willing to become a party to the so-called recognition and acquiescence, which, if it had the force now claimed for it, would deprive him and his co-owners of a strip of land, within their title deeds, approximately 2¾ rods wide, as the divisional line is located on the ground by the chancellor. As to Norman Clark, it is said that he recognized the line claimed by defendants, by his conduct as superintendent of the ·American Marble Company. Suffice it to say that the record does not show·what his conduct was as such superintendent, and no intendments are to be made against the decree.

Concerning the land outside the defendants' paper title, which they claim to own, the opinion states: "Nor is it found that each prior successive grantee, in writing or by parol agreement or understanding, transferred to his successor his possession of said land without the calls of his title deeds, accompanied by an actual delivery of the possession of the premises." Defendants say in their brief for reargument that it is clear from this statement in the opinion that the court does not have in mind the facts found and reported respecting the subject-matter, the brief stating: "It appears from the findings that upon the giving of the bond to Oliver and others the American Marble Company immediately.went into possession of this property. The land occupied by them and those claiming under them, namely, Burr, was inclosed and marked, first with a fence extending some 400 feet easterly from the west line, and, continuing easterly, by the apple tree, the row of large, tall, iron pins, and square-cut

marble block with the guy pin, the wooden post and the marble post; each of these objects being found by the chancellor to have been placed there for the purpose of marking the boundary, and to have marked the boundary from 1866 to 1885. This property passed back to Mead under his foreclosure, with this fence and those markers inclosing the land claimed. Mead transferred it to Bardin, and Mead pointed out to Bardin on the ground the exact location of the land which he was proposing to convey, and delivered possession thereof.''

The only transfer from Mead to Bardin was on July 1, 1873, and that was of a seven-sixteenths interest in the property within the defendants' title deeds. The fact asserted in the brief that Mead pointed out to Bardin on the ground the exact location of the land which he proposed to convey, and delivered possession thereof, is not borne out by the record; there is no finding to that effect. The facts shown by the record, of the nature of the others stated within the foregoing quotation from defendants' brief, may be considered as fairly warranting an inference that the possession of the strip of land outside the defendants' title deeds, was by parol transferred by each of the grantees to his successor, accompanied by actual delivery of the possession of the premises, and yet that is not sufficient; for the decree rendered shows by intendment that such inference was not drawn; such facts not found. The land not being included in the several deeds, an actual transfer of possession thereof in each instance was necessary to be shown and found as a fact. Without such fact being established, the possession could not be tacked in making out privity of estate or of possession, between the successive disseisors, essential to continuity of possession. *Winslow* v. *Newell,* 19 Vt. 164; 2 C. J. 92; *Humes* v. *Bernstein,* 72 Ala. 546; *Illinois Cent. R. Co.* v. *Hatter,* 207 Ill. 88, 69 N. E. 751; *Wishart* v. *McKnight,* 178 Mass. 356, 59 N. E. 1028, 86 Am. St. Rep. 486; same case, 184 Mass. 283, 68 N. E. 237; *Rich* v. *Naffziger,* 255 Ill. 98, 99 N. E. 341.

In referring to what the opinion says upon the subject of guys, namely, that the acts of placing guys on the land now owned by the plaintiff, are not found to have been under a claim of right, defendants say in their brief for reargument, that the Court must have overlooked some facts found and reported by the chancellor, naming as among such facts, that these guys were placed upon the ''Clark lot'' (Fant lot) by the American Marble

Company when it began its operations, (quoting from the brief,) "not only under a claim of right, but by purchase of the right to so place them." In this connection reference is made in the brief to Exhibits 38 and 41, and to article 96 of the findings. Exhibit 38 is defendants' plan; and Exhibit 41 is the statement in writing signed by Horace G. Clark in connection with the making of the Green plan, as already noticed. Article 96 contains no finding that any of the guys in question were placed on the "Clark lot," or maintained there, under a claim of right. The writing mentioned is copied into the record under the article named, but it is nowhere found that the statement in the writing, relating to "the sale of the right to attach three guys at or about the points on the 10-rod lot as now in use," or the somewhat similar declaration stated on Exhibit 38 to have been made by Mead, was true in fact. Such a statement by Mead, if properly shown, and the statement in the writing by Horace G. Clark, though evidence against them respectively, were not evidence against their co-tenants. *Blondin* v. *Brooks*, 83 Vt. 472, 76 Atl. 184. And the fact of such a purchase is not found. So the only right, if any, the defendants have to place and maintain their guys on the plaintiff's land rests on adverse enjoyment of the easement in connection with the use and occupancy of the land now owned by them; and in order to make out such a right it was necessary for defendants to prove an uninterrupted adverse enjoyment of the easement for a period of 15 years by themselves or their predecessors in title, or both combined. *Perrin* v. *Garfield*, 37 Vt. 304. The three Clarks who, with Oliver, were the obligees in the bond from Mead for a deed of the property now owned by the defendants, were associated in the formation and operation of the American Marble Company. Horace G. Clark was president of the company, and Norman Clark was superintendent. During all the time that company was in operation, the three Clarks were also interested in the property now owned by the plaintiff, either as obligees in the bond for a deed thereof with the right to enter thereon to open, develop, and work all marble quarries on said premises, or as tenants in common (after the deed was given) the owners of the major part of the land conveyed. The Clarks being thus interested in the two properties, severally, and in the operation and management of the company named, their relations in these respects were important matters for consideration in deciding whether the use of the prop-

erty now owned by the plaintiff for anchoring or hitching guys or guy ropes thereon for the benefit of the other property, was adverse or permissive. In such circumstances adverse character is not to be presumed. "The general rule is that the enjoyment of an easement of this character is presumed to be adverse unless something appears to rebut that presumption. * * * There are some cases where the user is of such a character, and the circumstances attending it are such, as to show that it was a mere privilege enjoyed by leave of the proprietor of the servient tenement, express or implied, and not adverse"; and in some circumstances the use "would be presumed to be *de gratia,* or with the express or implied permission of the proprietor of the servient tenement." *Plimpton* v. *Converse,* 44 Vt. 158; *Perrin* v. *Garfield,* cited above; *Bradley Fish Co.* v. *Dudley,* 37 Conn. 136.

In the case last cited the plaintiff was a voluntary association and sued as such. The action was for obstructing an alleged right of way leading from the plaintiff's fish place over defendant's land to a public highway. A prescriptive right of way was claimed. The defendant insisted that the user upon the conceded facts could not be adverse, because the owners of the premises over which the way was claimed to be, were themselves during the entire period of the user active members of the plaintiff association. The court stated the question to be, whether one's own land may be subjected to an easement in favor of himself and another as joint owners of other lands. It was held that in such circumstances an easement may exist, but that the use ought, more than in ordinary cases, to appear to be under a claim of right. The court said the interest of the owners of the land over which was the alleged way, in the business of their associates, might lead them to permit a passage over their individual lands, and on the question of fact a jury might think the use should be referred to such permission rather than to a claim of right; that the relation in which the parties stand to each other may often serve to indicate the character of the use; and that the fact that the owner of the land over which the way was claimed was himself a member of the plaintiff association and largely interested in its business, might be, and was, an important matter to be weighed in deciding whether the use was adverse or permissive.

On April 27, 1872, by decree of foreclosure becoming absolute, Mead again became the sole owner of the property pre-

viously owned and operated by the American Marble Company, and remained such owner until the 1st day of July, 1873. During this same time, he was a co-tenant in ownership of the property now owned by the plaintiff, and he could gain a prescriptive right of easement therein only by user adverse to his co-tenants. *Reed* v. *West,* 16 Gray (Mass.) 283.

If a co-tenant enter upon the whole or part of the common property, as he has a legal right to do, the law presumes that he intends nothing beyond an assertion of his right. In order to sever his relation as co-tenant, and render his possession adverse, it must be affirmatively shown that the other co-tenants had knowledge of his claim of exclusive ownership, accompanied by such acts of possession as were not only inconsistent with, but in exclusion of, the continuing rights of the other co-tenants, and such as would amount to an ouster as between landlord and tenant. *Chandler* v. *Ricker,* 49 Vt. 128; *Holley* v. *Hawley,* 39 Vt. 525, 94 Am. Dec. 350; *Roberts* v. *Morgan,* 30 Vt. 319; *Leach* v. *Beattie,* 33 Vt. 195.

A similar relation of the parties was created on June 14, 1905, when defendant Eastman, then the owner of the property within his present title deeds, took a conveyance by warranty deed of one-third interest in an undivided one-tenth part of the land within the plaintiff's title deeds, and on which the defendants' guys are anchored and fastened, and the same principles of law are applicable. Furthermore, the record before us shows that the aforesaid interest in the land was purchased by Eastman for a valuable consideration by him paid therefor. There is nothing in the case indicating that he made such purchase for the purpose of quieting his own title, or to protect him against litigation. Such purchase and acceptance of the warranty deed, amounted to an acknowledgment that the title was in the common owners, the interest of one of whom he took by the purchase, and it was evidence tending to show that the previous user (by way of anchoring and fastening guys on the land) was not adverse, or under a claim of right. *Tracy* v. *Atherton,* 36 Vt. 503; *Perrin* v. *Garfield,* cited above.

Regarding such guy attachments between the time when Mead sold the property of the dominant estate on July 1, 1873, and the time when Eastman became a tenant in common in ownership of the servient estate in 1905, the findings show that Green, in making his resurvey in the latter part of July, 1873,

30

"located points on the Clark lot where derrick guys were fastened, and having completed his survey, he made a scale drawing of the same, showing in detail the monuments * * * and the guy hitches located on the Clark lot"; that in 1890 the large stone with the guy attachment in the Brown and Green line was visible; that at some time after Eastman began operations the old derrick was replaced by a new one, and the new derrick was guyed at substantially the same locations as the old one had been, excepting that there were not so many guys on the new mast as there had been on the old; and that defendants are maintaining upon the premises three guy attachments which are north of the so-called "pin line."

It is quite evident from the record that the proof and inferences touching the question of the easement claimed, are not all one way; and it cannot be said, as matter of law, that within the time asserted by defendants, there was an uninterrupted user and enjoyment of the easement for a period of 15 years under a claim of right. Assuming that such a user and enjoyment might reasonably have been inferred from the facts reported, it must be intended that such inference was not drawn, for otherwise the decree rendered by the chancellor was not warranted. So the case stands in this respect, that facts essential to the establishment of the prescriptive right of easement are not found; and thereon the burden was with the defendants. *Barber* v. *Bailey,* 86 Vt. 219, 84 Atl. 608, 44 L. R. A. (N. S.) 98.

The defendants' brief in support of the motion for reargument has been carefully considered, and no substantial ground for the motion is found.

*The motion for reargument is denied.*